Patricia BATY, Plaintiff,

v.

WILLAMETTE INDUSTRIES,
INC., Defendant.

No. 96–2181–JWL.

United States District Court,
D. Kansas.

Sept. 5, 1997.

Steven M. Sprenger, The Sprenger Law Firm, Kansas City, MO, Craig M. Leff, Kansas City, MO, for Plaintiff.

Rody P. Biggert, Andrew M. Altschul, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, John M. McFarland, Rosalee M. McNamara, Charles J. Williams, Michael J. Abrams, Lathrop & Gage L.C., Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this action, plaintiff sued defendant, her former employer, alleging hostile work environment sexual harassment and retaliatory discharge under Title VII of the federal Civil Rights Act. After a trial held over four days

in June of 1997, a jury found for plaintiff on both counts. With respect to the sexual harassment claim, the jury awarded $120,000 in compensatory damages and $500,000 in punitive damages. With respect to the retaliation claim, the jury awarded $25,000 in compensatory damages, $500,000 in punitive damages, $40,000 in back pay, and $165,000 in front pay. The court entered judgment in accordance with the verdict. The matter is presently before the court on defendant's motion for judgment as a matter of law or, alternatively, for a new trial or remittitur (Doc. 124), as well as defendant's motion to stay proceedings on the issue of attorney fees until disposition of the other post-trial issues (Doc. 138).

Defendant's substantive post-trial motion is granted in part and denied in part. With the exception of back and front pay, which the court properly determines, the court rejects defendant's challenges to the jury's verdict; the court concludes that the jury's findings of liability and its compensatory and punitive damage awards are properly supported by evidence and are not contrary to law. In applying Title VII's damages cap, however, the court reduces the total award for compensatory and punitive damages to $300,000. The court also awards plaintiff back pay in the amount of $38,063 and front pay in the amount of $22,420. Accordingly, the court orders that judgment be entered in favor of plaintiff in the total amount of $360,-483. Finally, defendant's motion to stay is granted, and defendant is permitted until September 22, 1997, to file any opposition to plaintiff's fee memorandum.

## I. Motion for Judgment as a Matter of Law

At the close of evidence at trial, defendant moved for judgment as a matter of law on all issues under Fed.R.Civ.P. 50(a). The court granted the motion with respect to plaintiff's continuing violation theory, ruling that plaintiff could not recover damages for sexual harassment occurring before June 16, 1994, the date 300 days before plaintiff filed her administrative charge. The court denied the motion in all other respects. Defendant now renews its motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b).

### A. Standard

Judgment as a matter of law under Rule 50(b) "should be cautiously and sparingly granted." *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988). The jury's verdict must be affirmed if, "viewing the record in the light most favorable to [the nonmoving party], there is evidence upon which the jury could properly return a verdict for [the nonmoving party]." *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir.1996). A court does not weigh the evidence, pass on the credibility of the witnesses, or substitute its conclusions for those of the jury. *Id.* On the other hand, judgment as a matter of law must be granted if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law. *Id.* at 1546–47 (citing Fed. R.Civ.P. 50(a)). A legally sufficient basis requires more than "a scintilla of evidence" favoring the nonmoving party. *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir.1988).

### B. Hostile Work Environment

As stated above, because plaintiff did not meet the requirements for a continuing violation, she may recover only for sexual harassment occurring after June 16, 1994. Defendant asserts that plaintiff was not subjected to a hostile work environment after that date as a matter of law.

The Supreme Court has set forth the following standard for hostile work environment sexual harassment:

> When the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, ... Title VII is violated.

> This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. As we pointed out in *Meritor*, mere utterance of an epithet which engenders offensive feel-

ings in [an] employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2405, 2405, 91 L.Ed.2d 49 (1986)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at 23, 114 S.Ct. at 371.

Plaintiff testified at trial that the following conduct took place after June 16, 1994:(1) Other employees called plaintiff "bouncing Betty" or "flopping Frieda" in reference to her breasts "very numerous times, all the way up till the day [she] left the place" on November 21, 1994.(2) Between the first of June and mid-July in 1994, graffiti about plaintiff appeared on a wall in a men's bathroom at the plant where plaintiff worked. Chuck Elliott, a fellow employee, told plaintiff about the graffiti and stated to her, "Well, you fucked me and—and now you fucked Dale [McGinnis, plaintiff's supervisor] and now Justin [Marco, another employee]." [1] (3) From July through September of 1994, graffiti appeared "numerous times" in the men's room. Examples of the graffiti included "Patty [plaintiff] gives good head, ask Dale McGinnis;" "Patty gives good head, ask Ralph McGinnis [Dale's brother, another management employee];" "Patty three, union one;" "Patty sucks a big dick;" "Patty sucks a good dick, just ask Ralph;" and "Patty sucks a big dick." On a couple of occasions after she was told about the graffiti, plaintiff was permitted to go the men's room to observe it for herself.[2] (4) On August 18, 1994, plaintiff was told about graffiti in the plant's oil room, in foot-high yellow letters, stating "Patty

blew me here." (5) Until September of 1994, a large number of employees made comments to plaintiff about the various graffiti. Plaintiff testified that "it was just general shop talk at that point to make fun of it." In general, the employees "wanted to know if [plaintiff] performed the acts that were listed on the bathroom wall." Plaintiff's co-workers asked her such questions as "Do you really do things like that?", "Is that how you got your job?" and "Did you fuck your way to the top?" (6) In July of 1994, Ron Thurston, a fellow employee, "again started in with his 'what made me hot' comments and—and telling [plaintiff] how good [she] looked, [she] looked good enough to eat." Mr. Thurston "[i]nformed [plaintiff] that he had had his wife shave his crotch because she ended up with pubic hair in her teeth," and made other comments "of that nature." (7) On August 18, plaintiff endured more "verbal abuse" from Thurston: "Mr. Thurston had started in with more of his comments about my body and what made me hot, what turned me on. Those were his favorite questions to ask me. If I could suck a golf ball through a garden hose at 150 feet. He discussed blow jobs, things he did to his wife. Just things of that nature."

The court concludes that, when this evidence is viewed the light most favorable to plaintiff, the harassment of plaintiff was sufficiently pervasive and hostile to constitute a hostile work environment. Defendant emphasizes that the above incidents did not involve physical touching, they did not involve any supervisory personnel, and the graffiti was done anonymously and was generally not seen by plaintiff. It is true that "[c]asual or isolated manifestations of discriminatory conduct, such as a few sexual comments or slurs, may not support a cause of action." *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1175 (10th Cir.1996). It is undisputed, however, that "evidence that a

---

1. Defendant claims that plaintiff may not recover for Mr. Elliott's statement because she did not definitively pinpoint the incident to a date after June 16, 1994. The court concludes, however, that the jury reasonably could have concluded that the remark was made after June 16.

2. The court rejects defendant's argument that an incident of graffiti in September should not be considered because no *new* graffiti was written then, rather old graffiti that had been covered up was uncovered. An employee's deliberate uncovering of old graffiti can only be seen as a reaffirmation of the prior sentiment.

woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII based on the theory of hostile work environment." *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1539 (10th Cir.1995). Plaintiff was required to present evidence that she was subjected to a "steady barrage of opprobrious sexual comments." *Id.* at 1543.

The jury could reasonably have inferred from the evidence presented by plaintiff that she was in fact subjected to a steady stream of offensive sexual comments after June 16, 1994. The oral and written comments were explicitly sexual and were inherently demeaning, particularly so to the extent they linked plaintiff with her supervisors. Moreover, plaintiff's testimony indicated that the comments were fairly constant. Finally, although there is no evidence that management employees made any of the comments after June 16, plaintiff did present evidence indicating that they did not respond appropriately to the comments and in fact condoned and enjoyed the offensive conduct.

Where the Tenth Circuit has affirmed summary judgment if favor of the employer on the basis that no hostile work environment existed as a matter of law, the conduct has not been as severe or pervasive as that present in this case. For example, *Vigil v. City of Las Cruces*, 1997 WL 265095 (10th Cir. May 20, 1997), involved only two isolated incidents. Similarly, in *Lowe*, 87 F.3d 1170, the only gender-based comments were isolated. In *Howard v. Beech Aircraft Corp.*, 1995 WL 355252 (10th Cir. June 14, 1995), the Tenth Circuit concluded that the comments to the plaintiff had not been overtly sexual or frequent enough to establish a hostile work environment. Finally, *Gross*, 53 F.3d 1531 involved only a single gender-based remark in addition to various non-gender-based comments. In the present case, plaintiff presented evidence of numerous and regular comments that were extremely sexual and demeaning.

The cases from this district cited by defendant are equally distinguishable. In *Schweitzer–Reschke v. Avnet, Inc.*, 874 F.Supp. 1187 (D.Kan.1995), the undersigned granted summary judgment in favor of the defendant employer on the plaintiff's hostile work environment claim. Unlike the present case, most of the allegedly objectionable conduct had not been based on the plaintiff's gender. *See id.* at 1193–94. The plaintiff alleged that her supervisor had regularly asked about her sex life in *Schweitzer–Reschke*, but the court concluded that the comments had not created a work environment so objectively hostile as to alter the conditions of the plaintiff's employment. *Id.* at 1194. Contrary to that case, which involved relatively innocuous references to sexual activity, here the gender-based comments directed at plaintiff were graphically sexual and inherently belittling. In *Mart v. Dr Pepper Co.*, 923 F.Supp. 1380 (D.Kan.1996), on which defendant also relies, the comments had been far more isolated and had not all been directed at the plaintiff. The conduct at issue in *Ballou v. University of Kansas Medical Center*, 871 F.Supp. 1384 (D.Kan. 1994), consisted of excessive attention and not degrading behavior. In the present case, the comments were sufficiently demeaning to alter the conditions of plaintiff's employment with defendant.

Finally, defendant argues that the court should consider the context of plaintiff's particular work environment, in which "rough hewn and vulgar" language was common. *See Gross*, 53 F.3d at 1538; *Ebert v. Lamar Truck Plaza*, 878 F.2d 338, 339 (10th Cir. 1989). As the court noted in its order denying summary judgment in this case, the comments here were not merely vulgar but were sexually explicit and derogatory, and could therefore support liability for hostile work environment sexual harassment. *See Baty v. Willamette Indus.*, 1997 WL 292123, at *5 (D.Kan. May, 1, 1997).

For the foregoing reasons, the court concludes that the evidence presented by plaintiff, which indicated that she was subjected to a "steady barrage of opprobrious sexual comments," was legally sufficient to support a finding that plaintiff was subjected to a hostile work environment under Title VII. The court therefore denies defendant's motion for judgment as a matter of law on this issue.

## C. Employer Liability

■ Defendant next argues that it cannot be liable as a matter of law for the hostile work environment created by its employees. In the Tenth Circuit, an employer may be held liable under Title VII for hostile work environment sexual harassment if "[t]he employer knew about, or should have known about, the harassment and failed to respond in a reasonable manner." *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1446 (10th Cir. 1997) (citing Restatement (Second) of Agency § 219(2)(b)), *pet. for cert. filed*, 66 U.S.L.W. 3137 (U.S. Aug. 6, 1997).

Defendant contends that, as a matter of law, its response to the harassment of plaintiff was reasonable. Defendant points to evidence that it hired a handwriting expert to attempt to determine who had written the graffiti, conducted an investigation into harassment at the plant, conducted sexual harassment training for its employees, painted over the oil room graffiti, called the police about the oil room graffiti, and held various meetings about the harassment, including meetings with Ron Thurston.

Nevertheless, the court concludes that there was sufficient evidence by which a reasonable jury could have concluded that defendant's response was inadequate. Throughout the course of her employment with defendant, plaintiff made numerous complaints to supervisors and other management personnel about harassment of her; accordingly, defendant knew, or at least should have known, that a serious harassment problem existed at the Kansas City plant.[3] Moreover, plaintiff presented evidence of defendant's lackadaisical attitude towards the harassment occurring within its walls, indicating that management condoned and even encouraged the creation of a hostile work environment for plaintiff, especially given plaintiff's complaints about harassment by her supervisors. Specifically, the jury could reasonably have concluded that the small amount of training given the employees was inadequate in light of the severity of the

problem. The jury could also have reasonably found that the investigation conducted by defendant was a sham given the investigators' conclusion that no harassment had taken place at the plant and defendant's refusal to discipline any of its employees. The evidence, taken in the light most favorable to plaintiff, revealed that defendant did not make clear that harassment of plaintiff would not be tolerated; therefore, the court cannot conclude that defendant's response was sufficient to preclude liability as a matter of law.

Defendant argues that the lack of any response by defendant before June 16, 1994, is irrelevant to this issue. Even without considering that fact, the jury could reasonably have concluded that defendant was merely going through the motions in responding to the harassment after June 16. Moreover, the absence of any response earlier provides evidence of defendant's attitude towards harassment generally and after June 16 specifically.

Defendant also asserts that its response was adequate as a matter of law because the harassment of plaintiff ceased thereafter. The evidence contradicts this assertion, however. Plaintiff testified that the "bouncing Betty" and "flopping Frieda" comments continued until the end of her employment in November of 1994. The comments to plaintiff about the graffiti continued until September of 1994, after the remedial action cited by defendant. The comments by Ron Thurston in August also succeeded these remedial efforts.

The court concludes that there was sufficient evidence here from which a rational factfinder could have concluded that defendant's response to the harassment was not reasonable, and that liability for the hostile work environment sexual harassment of plaintiff may be imputed to defendant.

## D. First Amendment

■ Defendant also argues that, because the hostile work environment here was based on written and oral comments, the First Amendment prohibits a finding of liability.

---

**3.** Plaintiff complained about numerous inappropriate comments to her, graffiti, an extremely graphic and sexually offensive fake Chinese menu that was distributed by Dale McGinnis, incidents of inappropriate touchings by Ralph McGinnis, and the presence of a swimsuit calendar and sexually offensive statuette in Dale McGinnis's office.

The court rejected this argument when it denied defendant summary judgment. *Baty*, 1997 WL 292123, at *7–8. As it noted in its previous order, the court is persuaded by the reasoning in *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486 (M.D.Fla.1991). Moreover, since *Robinson*, the Supreme Court has indicated that Title VII does not regulate speech in violation of the First Amendment. *See Wisconsin v. Mitchell*, 508 U.S. 476, 487, 489, 113 S.Ct. 2194, 2200–01, 2201–02, 124 L.Ed.2d 436 (1993) (Title VII is an example of a permissible content-neutral regulation of conduct; evidentiary use of defendant's speech is permitted in evaluating a Title VII claim); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992) (citing Title VII to illustrate that words may, without constitutional implication, violate laws directed not at speech but at conduct). Defendant's citation to the Supreme Court's recent decision in *Reno v. American Civil Liberties Union*, —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), which involved a law that regulated pure speech instead of conduct, is unavailing.

The court concludes that the First Amendment does not preclude a finding of defendant's liability for hostile work environment sexual harassment.

### E. Retaliation

■ Defendant seeks judgment as a matter of law on plaintiff's claim that defendant terminated her employment in retaliation for her complaining about sexual harassment. Defendant points to evidence that it fired plaintiff because it anticipated that an upcoming paper shortage would result in less business for the plant.

The court concludes that plaintiff submitted sufficient evidence of retaliation here. Specifically, there was ample evidence before the jury that the reasons given plaintiff for her termination were pretextual. Plaintiff testified that, when she was terminated, she was told that she had been hired to replace a particular supervisor, who had not retired as planned; there was evidence, however, that defendant knew of the delay in this employee's retirement before it hired plaintiff in April of 1994.

There was also ample evidence that defendant's paper-shortage rationale was a mere pretext for retaliation. For instance, just before plaintiff's termination, defendant's budget actually projected *increased* production. Plaintiff was told that defendant would not be able to pay her salary in 1995, but the plant made more money that year than in the previous year, and all employees received bonuses. Plaintiff was the only employee let go, despite being a capable employee. Defendant also advertised job openings for production work soon after plaintiff's termination.

This evidence of pretext was supported by additional evidence that defendant acted with a retaliatory motive. Only a few months earlier, plaintiff had made numerous complaints about sexual harassment, and defendant had been put to the expense of an investigation of the plant. Plaintiff testified that she experienced resentment from management after the investigation and that employees were told not to speak to her. In addition, the jury heard evidence that another employee, Sheila Summers, who had corroborated plaintiff's complaints during the investigation, was fired in September of 1994 for questionable reasons.

In light of the foregoing evidence, the court concludes that the jury could reasonably have concluded that plaintiff was terminated in retaliation for complaining about sexual harassment. Defendant's motion is denied with respect to this issue.

### F. Compensatory Damages

The jury awarded plaintiff compensatory damages of $120,000 on her sexual harassment claim and $25,000 on her retaliation claim for mental anguish, humiliation, emotional pain, inconvenience, and loss of enjoyment of life. Defendant argues that the evidence was not sufficient to support such awards as a matter of law. The court disagrees.

■ Plaintiff testified to a number of emotional and physical effects from defendant's conduct. Specifically, plaintiff testified that she felt upset, frustrated, humiliated, and embarrassed; that she felt resentment from

other employees, including management personnel; that she experienced stress, headaches, and weight fluctuations; that she found it difficult to do her work; and that the harassment had generally "made [her] life hell." Plaintiff's psychological expert testified that plaintiff suffered from post-traumatic stress disorder through 1996 as a result of the harassment and termination. This evidence, viewed in the light most favorable to plaintiff, was sufficient to establish plaintiff's entitlement to compensatory damages.

Defendant argues that plaintiff did not segregate her injuries before and after June 16, 1994. The evidence indicated, however, that plaintiff's injuries continued after June 16, and the jury could reasonably have concluded that plaintiff suffered compensable injury after that date. Moreover, the court concludes that the amount awarded by the jury in compensatory damages was not excessive as a matter of law in light of the ongoing nature of the harassment, the resentment of plaintiff by management, and defendant's attitude towards her complaints.

### G. Punitive Damages

The jury also awarded plaintiff punitive damages in the amount of $500,000 for each claim. The jury was instructed that it could award punitive damages if it found that defendant acted with "malice or reckless indifference to the plaintiff's right to be free from hostile work environment sexual harassment and/or retaliation." See 42 U.S.C. § 1981a(b)(1). Defendant argues that it did not act with malice or reckless indifference as a matter of law.

The court concludes that the evidence was sufficient to support a punitive damage award on plaintiff's hostile work environment claim. Plaintiff presented evidence from which a reasonable jury could have inferred that management did not really respond to plaintiff's complaints, despite knowledge of serious problems with harassment; that defendant conducted a sham investigation to appease plaintiff and other victims of harassment at the plant; and that

management employees actually condoned the harassment. Accordingly, a reasonable jury could have found that defendant acted with malice or reckless indifference with respect to the sexual harassment of plaintiff.

The court also concludes that the evidence was sufficient to support a punitive damage award on plaintiff claim of retaliation. The jury could reasonably have inferred malice or reckless indifference from the evidence of resentment of plaintiff by management after the investigation and what could be viewed as patently false reasons given to plaintiff at the time of her termination.

Finally, the punitive damage awards were not excessive as a matter of law. The jury could reasonably have concluded that such large awards were necessary to deter defendant, a huge national company, from like conduct in the future.[4]

### II. Motion for New Trial

As an alternative to its motion for judgment as a matter of law, defendant moves for a new trial or remittitur. Motions for a new trial are committed to the sound discretion of the trial court. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); *Hinds v. General Motors Corp.,* 988 F.2d 1039, 1046 (10th Cir.1993). They are "not regarded with favor and should only be granted with great caution." *United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.1991).

In reviewing a motion for a new trial the court must view the evidence in the light most favorable to the prevailing party. *Griffin v. Strong,* 983 F.2d 1544, 1546 (10th Cir. 1993). A new trial based upon an error of law is unwarranted unless that error affected the substantial rights of the parties. Fed. R.Civ.P. 61; *Heyen v. United States,* 731 F.Supp. 1488, 1489 (D.Kan.1990), *aff'd,* 945 F.2d 359 (10th Cir.1991). "The party seeking to set aside a jury verdict must demonstrate trial error which constitutes prejudicial error or that the verdict is not based on substantial evidence." *White v. Conoco, Inc.,*

---

4. That the punitive damage awards were not excessive as a matter of law is especially apparent after application of Title VII's cap on damages. *See infra* Part III.

710 F.2d 1442, 1443 (10th Cir.1983). The court should "ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip.*, 464 U.S. at 553, 104 S.Ct. at 848.

Defendant first argues that it is entitled to a new trial because the jury's verdict with respect to liability, compensatory damages, and punitive damages was contrary to the clear weight of the evidence. A new trial is not warranted unless the verdict was "clearly, decidedly, or overwhelmingly" against the weight of the evidence. *May v. Interstate Moving & Storage Co.*, 739 F.2d 521, 525 (10th Cir.1984).

The court rejects this argument. The court found plaintiff to be a very credible witness; a distinct lack of credibility, on the other hand, predominated among defendant's witnesses. Accordingly, because the weight of the evidence was most clearly in *plaintiff's* favor, the reasons articulated by the court in denying defendant's motion for judgment as a matter of law apply here as well in support of the jury's verdict, which should therefore be left undisturbed.

■ The court also rejects defendant's various claims of trial error. Defendant contends that the court erred in admitting evidence of harassing conduct occurring before June 16, 1994. The court concludes that such evidence was properly admissible for a number of purposes. First, when plaintiff put on her evidence, she still maintained a claim for damages for such conduct under a continuing violation theory; the court did not grant defendant judgment as a matter of law on that theory until the close of the evidence. The full extent of the harassment and plaintiff's complaints during her employment was also admissible for other purposes: as evidence that defendant had knowledge of harassment at the plant as required for employer liability for hostile work environment sexual harassment; as evidence of whether defendant's response to the post-June 16 harassment was reasonable, given the extent of the problem at the plant; to show that plaintiff's complaints of sexual harassment were made in good faith, as required for plaintiff's retaliation claim; and as evidence

of a retaliatory motive in terminating plaintiff.

Moreover, the court gave a limiting instruction to the jury to explain the purposes for which such evidence could be considered. Because the evidence was admissible for some purposes, defendant's proposed instruction that conduct occurring before June 16 had no legal relevance did not correctly state the law, and the court properly refused to give it.

■ In the same vein, defendant argues that the court erred in admitting Sheila Summers's testimony concerning her termination because her termination was not at issue in the case. That testimony was admissible, however, to show that defendant terminated plaintiff in retaliation for complaining about sexual harassment.

Defendant argues in a footnote in its brief that the court erred in not including in the hostile work environment instructions the Tenth Circuit's statement in *Gross* that language is "rough hewn and vulgar" in some environments. 53 F.3d at 1538. The court concludes that the instructions accurately stated Tenth Circuit law on Title VII hostile work environment. Moreover, as stated above, the offensive conduct here went beyond mere vulgarity.

■ Defendant also contends that a new trial is warranted because in closing argument plaintiff's counsel suggested that defendant purposefully allocated less paper to the Kansas City plant to provide a defense to plaintiff's retaliation claim, and no evidence supported such a statement. There is no indication in defendant's papers, however, that defendant raised a timely objection to the statement, nor does the court recall one, and the court's failure to strike the statement on its own motion would not constitute plain error. *See* Fed.R.Evid. 103. In any event, the statement was not sufficiently prejudicial to constitute grounds for a new trial, even if it were to be viewed as beyond the reach of inferences to which plaintiff might be entitled and outside the bounds of proper argument.

■ The court also rejects defendant's argument that the jury's time of deliberation—three hours on a Friday afternoon—

suggests that the jury did not properly deliberate and supports granting a new trial here. There is no indication that the jury did not follow the court's instructions in reaching a lawful verdict.[5]

Defendant's motion for a new trial or remittitur is denied.

### III. Statutory Cap on Damages

■ Although the court concludes that the jury's damage awards were supported by the evidence, it must nonetheless reduce the judgment entered in plaintiff's favor to comply with the statutory cap on damages. Compensatory and punitive damage awards under Title VII are governed by 42 U.S.C. § 1981a. Section 1981a(b)(3) provides that "[t]he sum of the amount of compensatory damages awarded under this section . . . and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party" $300,000 for employers of defendant's size.

Plaintiff argues that the $300,000 cap should be applied to each of her two claims because she suffered two distinct injuries. Defendant contends that a single cap applies to plaintiff's entire recovery in the suit.

The court agrees with defendant that only one cap applies. Section 1981a(a)(1) provides that "[i]n an action" under Title VII the plaintiff may recover compensatory and punitive damages allowed in subsection (b). Plaintiff concedes that "action" generally means "lawsuit". Although plaintiff has asserted two claims for separate violations of Title VII, she has done so in a single lawsuit. Thus, the plain language of the statute limits the compensatory and punitive damages recoverable by "each complaining party" to the cap amount, regardless of the number of Title VII claims or violations. Such interpretation is further supported by subsection (b)(1), which permits an award of punitive damages if the employer has "engaged in a discriminatory practice or discriminatory practices"; the implication is that a single award, subject to a single cap, is permitted for numerous Title VII violations.

Finally, two weeks ago, the Tenth Circuit adopted the single-cap interpretation in *Nelson v. Rehabilitation Enterprises of North Eastern Wyoming*, 1997 WL 476111 (10th Cir. Aug.21, 1997).[6] In *Nelson*, the court held that the "clear and unambiguous language" of section 1981a(b)(3) indicated that a cap applies "for each complaining party" and not to each Title VII claim, and that the district court had properly applied the cap a single time to the aggregate damages awarded on the plaintiff's sexual harassment and retaliatory discharge claims under Title VII. *Id.* at *4.

The court therefore reduces the total award to plaintiff for compensatory and punitive damages with respect to her sexual harassment and retaliation claims to $300,000, and judgment shall be entered accordingly.[7]

---

**5.** In a footnote in its reply brief, defendant states that the court's retaliation instruction was erroneous because it did not require that the jury find retaliation to be the determinative factor in the decision to terminate plaintiff. By omitting this issue from its original brief, defendant has failed to raise this issue properly as a basis for new trial. The court notes that it gave a "motivating factor" instruction in this trial for the reasons set forth in *Medlock v. Johnson & Johnson Cos.*, 1996 WL 707029, at *3 (D.Kan. Oct.7, 1996).

**6.** Although the Tenth Circuit generally does not favor citation to an unpublished opinion, such an opinion may be cited if, as in the present case, it has persuasive value on a material issue.

**7.** Plaintiff argues that the final award should be comprised of her entire combined awards for compensatory damages. Neither in the statute nor in any Supreme Court or Tenth Circuit case is there authority mandating or permitting an allocation by the district court of the cap amount between compensatory and punitive damages. Nonetheless, some courts have done so. *See e.g., Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 441 (7th Cir.1997); *Williams v. Pharmacia Opthalmics, Inc.*, 926 F.Supp. 791, 794 (N.D.Ind.1996). If such allocation is deemed necessary and the jury awards remain unchanged after appeal, the court would allot $145,000 for compensatory damages and $155,000 for punitives. Such allocation would serve Title VII's remedial purpose of compensating the victim, *see Williams*, 926 F.Supp. at 794, and also reflect the jury's intention to award both compensatory and punitive damages, *see Jonasson*, 115 F.3d at 441. In the event that the jury's verdict is only partially affirmed, the court believes that the cap amount should be reached by applying whatever damages remain, thereby altering the court's suggested allocation. *See Nelson*, 1997 WL 476111, at *3 n. 2 (refusing to

## IV. Equitable Relief

### A. Back Pay

█ The jury awarded plaintiff $40,000 in back pay as a remedy for defendant's retaliatory discharge of plaintiff. It is clear, however, that an award of back pay is an issue not for the jury but for the court. *See* 42 U.S.C. §§ 2000e–5(g)(1) (court may award back pay as equitable relief for Title VII violation), 1981a(c)(1) (jury trial right for compensatory or punitive damages), 1981a(b)(2) (compensatory damages under section 1981a do not include back pay, interest on back pay, or other equitable relief under section 2000e–5(g)). In addition, any award of back pay is not subject to the damages cap. *See* 42 U.S.C. § 1981a(b)(2), (3).

The court concludes that an award of back pay is appropriate and necessary to make plaintiff whole in this case. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–21, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975) (once liability is established, back pay should generally be awarded unless special circumstances exist). Plaintiff's economic expert, Dr. Gerald Olson, testified that plaintiff's back pay loss was in the approximate amount of $37,700 ($37,299 up to June 15, less than $500 more up to the time of trial).

█ Defendant states that it does not contest Dr. Olson's computation except to argue that plaintiff should not be compensated for the period of her voluntary unemployment between December of 1996 and February of 1997. The court agrees that plaintiff should not receive back pay for that two-month period. *See* 42 U.S.C. § 2000e–5(g)(1) (amounts earnable with reasonable diligence reduces back pay allowable). Therefore, the court reduces the $37,700 amount by $4,000 (the court's reasonable estimate based on the evidence of what plaintiff's earnings would have been at the job she left voluntarily), leaving a total back pay award of $33,700.

█ "Under Title VII, a district court is authorized to grant prejudgment interest on a back pay award." *Daniel v. Loveridge,*

32 F.3d 1472, 1478 (10th Cir.1994) (citing *Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988)). The court agrees with plaintiff that she should be granted interest on her back pay award in order that she be made completely whole. Because defendant has not disputed the applicability of the Kansas statutory rate, *see* K.S.A. § 16–201, as suggested by plaintiff, the court applies the ten percent rate set out in that statute. *See DuBose v. Boeing Co.,* 905 F.Supp. 953, 960 (D.Kan.1995) (granting interest on Title VII back pay award at Kansas statutory rate). The court concludes, however, that granting plaintiff interest from the date of plaintiff's termination at the full statutory rate on the entire back pay award would overcompensate plaintiff because she suffered this loss over time on each occasion after that date on which she did not receive compensation commensurate with her earnings with defendant. She did not incur the entire $33,700 loss on the day of her termination. To account for the periodic nature of the loss, the court grants plaintiff back pay interest in the amount of one-half of the ten percent rate applied to the entire award of $33,700 since November 21, 1994, the date of termination. Accordingly, the court grants plaintiff $4,363 in back pay interest, resulting in a total back pay award of $38,063.

### B. Front Pay

█ The jury also awarded plaintiff $165,000 in front pay. The parties agree, however, that front pay is not an item of compensatory damages under section 1981a and therefore presents an issue for the court. *See* 42 U.S.C. § 1981a(b)(2) (compensatory damages do not include equitable relief authorized under section 2000e–5(g)); *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1002 (10th Cir.1996) (equitable remedies allowable under section 2000e–5(g) included front pay); *see also Grimes v. Janesville Prods.,* 1997 WL 183547, at *3 (10th Cir. Apr.15, 1997) (noting that the court has held that an award of front pay under Title VII constitutes equi-

address harassment award because retaliation award, which the court upheld, brought damages to the cap level). The court does not believe that

the cap amount should be allocated by claim, as suggested by defendant. *See id.*

table relief outside the province of the jury); *Wulf v. City of Wichita*, 883 F.2d 842, 873 (10th Cir.1989) (front pay is an equitable remedy awarded in lieu of the equitable remedy of reinstatement); 5 Lex K. Larson, *Employment Discrimination* § 93.03 (2d ed.1997). For the same reason, an award of front pay would not be subject to the $300,000 cap on compensatory and punitive damages applicable here.

█ The court concludes that an award of front pay is appropriate and necessary here. Neither side seeks reinstatement, nor does the court believe that reinstatement would be feasible under all of the circumstances. *See Griffith v. State of Colo., Div. of Youth Servs.*, 17 F.3d 1323, 1330 (10th Cir.1994) ("the equitable remedy of front pay may be awarded where an employer has created such a hostile work environment that reinstatement is not a reasonable remedy").

█ In awarding front pay, the court must determine "the amount required to compensate a victim for the continuing future effects of discrimination until the victim can be made whole." *Carter v. Sedgwick County, Kan.*, 929 F.2d 1501, 1505 (10th Cir.1991). "[A] front pay award must specify an ending date and must take into account any amount that the plaintiff could earn using reasonable efforts." *Id.* Applying these standards, the court concludes that plaintiff will be made whole by a front pay award of $22,420 based on a period extending five years into the future.

At the time of her termination by defendant, plaintiff was earning a salary of $30,000 per year. At the time of trial, plaintiff was earning $27,000 per year. Dr. Olson opined at trial that the loss of future earnings resulting from plaintiff's termination amounts to $164,534.

Defendant has not challenged Dr. Olson's basic approach of comparing plaintiff's pay while working for defendant with her present income and estimating the difference in fringe benefits between the jobs. The court therefore adheres to that basic approach and uses Dr. Olson's calculation as its starting point, with the exception that it will not apply Dr. Olson's 4–1/2 percent pay increase rate to the raw numbers.[8]

█ The court does not believe, however, that plaintiff must be awarded front pay for the next thirty-five years in order to be made whole after the retaliatory discharge. In the first place, Dr. Olson projected lost earnings from plaintiff's present age of 32 until she reaches the age of 67, at which time she would be eligible to receive full social security benefits and, he opined, she would be likely to retire as a matter of usual practice. Dr. Olson's choice of ending date was not based on any consideration of plaintiff's employment history, defendant's employment practices or, most pertinently, plaintiff's employment intentions—there was absolutely no evidence concerning how long plaintiff was actually likely to work or intended to work. This lack of a particularized evidentiary basis specific to the actual participants in this case to support a fundamental part of the equation undermines the persuasiveness of Dr. Olson's opinion.[9]

---

**8.** In making his calculation, Dr. Olson applied a pay-growth rate of 4–1/2 percent based on historical averages. Such a rate is more appropriately applied, however, over the thirty-five-year period contemplated by Dr. Olson, in which time the average rate would more likely be realized. Dr. Olson did not base his calculations on plaintiff's actual situation. In fact, plaintiff's pattern has been to increase her pay at a more rapid rate, while there is no evidence of what has happened to defendant's overall pay scale even since plaintiff's termination. The court concludes that plaintiff is likely to increase her pay more rapidly than she would have with defendant had she remained employed there, at least in the short term as she overcomes any disadvantages based solely on newness to the job. Thus, the court makes no adjustment for expected increases on either side of the equation. The court applies a flat differential between plaintiff's present and former salary (with estimated benefits) extended for five years, which the court concludes will make plaintiff whole.

**9.** The persuasiveness of Dr. Olson's opinion is also undermined in the court's view by this witness's virtual assumption of an advocacy role. He appears to have accepted information provided to him by plaintiff in an uncritical fashion and then generated numerical conclusions to fit a rather stock set of economic assumptions largely favorable to plaintiff. Moreover, it is difficult not to note that Dr. Olson was generously compensated for what does not appear to have been a very individualized (or time-consuming) analysis.

In the second—and more crucial—place, neither Dr. Olson nor any other witness focused on whether plaintiff would likely be able to reach, before her retirement, the compensation level she would have been occupying had she not been terminated by defendant. No evaluation of plaintiff herself (her skills and training), the kinds of jobs available to one such as her, or the employment characteristics of defendant was presented. Instead, Dr. Olson appears merely to have made a mechanical computation based on an assumption that there would always be a compensation differential until retirement.

The court concludes that plaintiff may be made whole by an award of front pay for five years into the future. After considering the totality of the evidence, the court believes that plaintiff has demonstrated the ability to perform, acquire, and maintain jobs that would sooner rather than later enable her to make up any pay differential with respect to her job with defendant. For instance, in the last year plaintiff has progressed from a job with a salary between $22,000 and $23,000 to her present employment with a salary of $27,000. The court is not persuaded that defendant was a uniquely or unusually beneficent employer, or generous with its compensation out of proportion to an employee's market value; contrary to plaintiff's protestations, plaintiff's job with defendant was not, based on any objective evidence, "the job of a lifetime". Thus, the court sees no reason to believe that plaintiff will not soon be in as good a financial position as she would have been with defendant.

The court notes that, although plaintiff has lost some of the economic benefit from her seniority at defendant by her having to change jobs, she was not employed there very long and she should therefore make up rather quickly any gap in pay produced purely by seniority. Plaintiff was not an employee who had achieved a high rate of pay based on five or ten or twenty years of seniority,

for example, which she could not expect to recoup within just a few years. Such employees, or employees with highly specialized skills or training confronted with a lack of demand in the marketplace for such skills or training (who might have to take a lower-paying job just to get by), are those for whom a longer term should be anticipated in order to be made whole for the effects of discrimination. Such special considerations do not attend the present case.

The court realizes that plaintiff may actually "catch up" sooner than five years from now. In balancing the equities, however, the court believes that the wrongdoer—defendant—should bear any risk of a windfall to the other party. Thus, the court selects the five-year duration out of an abundance of caution in order to see that plaintiff is made whole.

Accordingly, the court calculates plaintiff's front pay award as follows: When last employed by defendant, plaintiff earned an annual salary of $30,000, with benefits estimated by Dr. Olson at 20.87 percent of her salary, for a total of $36,261 per year. At her present employment, plaintiff earns an annual salary of $27,000, with benefits estimated by Dr. Olson at 14.05 percent, for a total of $30,793 per year. The difference in salary and benefits, $5,468 per year, multiplied by a period of five years, yields a total of $27,340. After that figure is reduced to present value by applying a discount rate of seven percent (the rate used by Dr. Olson without any contrary suggestion from defendant), plaintiff is left with a front pay award of $22,420. The court orders an award of front pay in that amount.

## V. Summary

The court generally upholds the jury's verdict with respect to compensatory and punitive damages on plaintiff's two claims, but it reduces the total award for such damages to $300,000 in compliance with the statutory

Dr. Olson received $1,500 to write his report and $250 per hour for testifying. He is also no stranger to the courtroom, having testified at 48 trials in the past five years, appearing on behalf of the plaintiff in the overwhelming majority of cases. Although none of this renders his testimony inadmissible (indeed, defendant did not even mount that attack), it does mean that the court should not accept his testimony uncritically, but with the reasoned skepticism one might usually apply to a partisan's opinion.

cap. The court also awards plaintiff $38,063 in back pay and interest, and $22,420 in front pay. The court thus orders that judgment be entered in favor of plaintiff in the total amount of $360,483.

## VI. Motion to Stay

Plaintiff filed her motion for statutory attorney fees on July 9, 1997. On August 6, 1997, plaintiff filed a memorandum in support of her fee request, having satisfied the consultation requirement of D. Kan. 54.2. On August 20, 1997, defendant moved to stay proceeding on the attorney fee issue until the court disposed of it substantive post-trial motion.

The court grants the motion for stay. Because it has now ruled on the other motion, defendant is ordered to file any response to plaintiff's fee memorandum by September 22, 1997.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for judgment as a matter of law or, alternatively, for a new trial or remittitur (Doc. 124) is granted in part and denied in part. Plaintiff's award for compensatory and punitive damages is reduced to a total of $300,000 for claims of sexual harassment and retaliation. The court awards plaintiff $38,063 in back pay and $22,420 in front pay with respect to her retaliation claim.

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of plaintiff in the total amount of $360,483.

**IT IS FURTHER ORDERED THAT** defendant's motion to stay proceedings on the issue of attorney fees (Doc. 138) is granted. Defendant must filed any response to plaintiff's fee request by September 22, 1997.

**IT IS SO ORDERED.**