**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 7 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

PATRICIA BATY,

        Plaintiff-Appellee/
        Cross-Appellant,

   v.

WILLAMETTE INDUSTRIES, INC.,

        Defendant - Appellant/
        Cross-Appellee.

\----------------------------------------
CENTER FOR INDIVIDUAL
RIGHTS,

        Amicus Curiae.

Nos. 97-3299
and 97-3305

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## (D.C. NO. CV-96-2181-JWL)

Rody P. Biggert (William F. Dugan with him on the briefs), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Illinois, for appellant/cross-appellee.

Steven M. Sprenger, Sprenger & McCreight, L.C., Kansas City, Kansas (Scott A. McCreight, Sprenger & McCreight, L.C., Kansas City, Kansas, and Stephen R. McAllister, University of Kansas School of Law, Lawrence, Kansas, with him on the briefs) for appellee/cross-appellant.

Hans Bader, Center for Individual Rights, on the amicus curiae brief for the Center for Individual Rights.

Before **ANDERSON** , and **McWILLIAMS** , Circuit Judges, and **COOK** ,[*] District Judge.

**ANDERSON** , Circuit Judge.

Patricia Baty brought a Title VII action against her former employer, Willamette Industries, Inc., alleging hostile work environment sexual harassment, *quid pro quo* sexual harassment, retaliatory discharge, and various state law claims. Her hostile work environment and retaliation claims were tried to a jury, which awarded her a total of $145,000 in compensatory damages, $1 million in punitive damages, $40,000 in back pay and $165,000 in front pay on her two claims.

In ruling on Willamette's post-verdict motions for judgment as a matter of law or, alternatively, for a new trial or remittitur, the district court ultimately reduced the damages awarded Ms. Baty on both claims to $300,000 in compensatory and punitive damages, $38,063 in back pay, and $22,420 in front pay, for a total of $360,483. Willamette appeals that award, arguing it should be reversed or, alternatively, further reduced, or that the case should be remanded for

[*]The Honorable H. Dale Cook, United States District Judge for the Northern District of Oklahoma, sitting by designation.

a new trial. Ms. Baty cross-appeals, arguing that we should reverse the district court's award of $300,000 in compensatory and punitive damages and enter an award of $600,000. She further argues that, should we reverse the sexual harassment verdict and reduce the damages awarded, we should also reverse the district court's conclusion that she failed to establish a "continuing violation" and remand for a new trial on her sexual harassment claim. We affirm.

## BACKGROUND

On April 12, 1995, Ms. Baty filed her administrative charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging Title VII violations. Because the district court found that she failed to establish a "continuing violation," the court held that she could not receive compensation for incidents occurring before June 16, 1994, the date 300 days before she filed her charge. [1] The court permitted the jury to hear evidence of the pre-June 16, 1994, incidents, however, to establish Willamette's knowledge of the harassment, the unreasonableness of Willamette's response to the post-June 16, 1994, harassment, to show Ms. Baty's good faith and as evidence of a retaliatory motive in terminating Ms. Baty. See Baty v. Willamette Indus., Inc., 985 F. Supp. 987, 997

---

[1]Under 42 U.S.C. § 2000e-5(e), Ms. Baty's charge of discrimination had to be filed within 300 days after the allegedly unlawful practice. This administrative filing is a prerequisite to filing a Title VII civil suit.

(D. Kan. 1997). For purposes of this fact recitation, we therefore divide the alleged incidents of sexual harassment into those occurring before June 16, 1994, and those occurring after that date.

## I. Pre-June 16, 1994, Incidents

In October 1993, Ms. Baty began working for Willamette as a temporary employee at its Kansas City, Kansas, corrugated box plant. Her supervisors were plant manager Dale McGinnis and his brother, plant superintendent Ralph McGinnis. In November 1993, she worked near Chuck Elliott, who made various sexual comments to Ms. Baty, including: that "[she] had his wife beat in the boob department"; that she had a "nice butt"; that he would like to "fuck [her] brains out." Appellee's Supp. App. Vol. I at 62. She reported these incidents to Dale McGinnis. While Ms. Baty was in his office, Dale McGinnis showed her a small statue of a monkey and demonstrated its retractable penis. Ms. Baty also observed in Dale's office a poster of a "half naked, clad in a bikini, woman." Id. at 63.

Ms. Baty testified that Mr. Elliot's comments continued following her complaint. In late November 1993, Mr. Elliot informed Ms. Baty that there was graffiti on the men's bathroom wall suggesting that Mr. Elliot and Ms. Baty were

- 4 -

having a sexual affair. She again reported the incident to Dale McGinnis, who said "it would be taken care of." Id. at 65.

From late December 1993 through January 1994, Ms. Baty worked near Ron Thurston. Mr. Thurston made various sexual comments to Ms. Baty, including "what turned [her] on, what made [her] hot," and what her attitude toward oral sex was. Id. at 66-68. Ms. Baty testified she heard Mr. Thurston make comments to others about her physical appearance. Id. at 67. Ms. Baty reported these comments to Jim Beshears, Mr. Thurston's supervisor, who told her that he "would speak with [Mr. Thurston], and if it did not stop to let him know." Id. at 68.

During this same time period, Ms. Baty's supervisor, Ralph McGinnis, put his arm around Ms. Baty's waist, slid his hand up and grabbed her breast, and invited her to have drinks at a local bar. She declined, and complained about the incident to Dale McGinnis, who told her that he would talk to his brother, Ralph, that Ralph "got a little over zealous, a little over obnoxious sometimes, and not to take him too seriously." Id. at 74.

On April 1, 1994, Willamette offered Ms. Baty a full-time supervisor trainee position, which she accepted. In the first weeks of April 1994, Ralph McGinnis on two occasions again invited Ms. Baty out for drinks, which she

declined.  After the second invitation, she complained to Dale McGinnis, who said he "would take care of it."      Id. at 81.

In mid to late April, Ms. Baty heard maintenance supervisor Steve Harper say, "Well, here comes bouncing Betty.  Look at them tits flop.  Wouldn't I like to grab ahold of them."     Id. at 82.  Ms. Baty reported this comment to Dale McGinnis.  She testified that thereafter, Willamette's male employees referred to Ms. Baty on numerous occasions as "bouncing Betty" and "flopping Frieda."        Id. at 87-88.  In late April or early May 1994, Mr. Harper gave Ms. Baty a "performance evaluation form" containing sexual content.  Dale McGinnis soon thereafter told Ms. Baty that Mr. Harper had told a group of co-workers at a bar that he thought he could "fuck" Ms. Baty.      Id. at 87.

On several other occasions, Dale McGinnis asked Ms. Baty about her sunbathing activities, what kind of swim suit she wore, and told her he would like to watch her tan.  On another occasion he referred to Ms. Baty's cigarettes under her blouse as a "third tit" and offered to retrieve them.        Id. at 92.  He also distributed to Ms. Baty and other female employees a "Chinese menu" with sexually explicit and demeaning phrases.

The Willamette employees testified, generally, either that the incidents Ms. Baty related did not occur, or that Ms. Baty was a willing participant in any sexually oriented conversations or conduct.

## II.  Post-June 16, 1994, Incidents

The district court described the post-June 16, 1994 incidents at the plant as

follows:

(1) Other employees called plaintiff "bouncing Betty" or "flopping
Frieda" in reference to her breasts "very numerous times, all the way
up till the day [she] left the place" on November 21, 1994.  (2)
Between the first of June and mid-July in 1994, graffiti about
plaintiff appeared on a wall in a men's bathroom at the plant where
plaintiff worked.  [Mr.] Elliott . . . told plaintiff about the graffiti and
stated to her, "Well, you fucked me and--and now you fucked
Dale . . . and now Justin [Marco, another employee]."  (3) From July
through September of 1994, graffiti appeared "numerous times" in
the men's room.  Examples of the graffiti included "Patty gives good
head, ask Dale McGinnis;" "Patty gives good head, ask Ralph
McGinnis;" "Patty three, union one;" "Patty sucks a big dick;" "Patty
sucks a good dick, just ask Ralph;" and "Patty sucks a big dick."  On
a couple of occasions after she was told about the graffiti, plaintiff
was permitted to go [to] the men's room to observe it for herself.  (4)
On August 18, 1994, plaintiff was told about graffiti in the plant's oil
room, in foot-high yellow letters, stating "Patty blew me here."  (5)
Until September of 1994, a large number of employees made
comments to plaintiff about the various graffiti.  Plaintiff testified
that "it was just general shop talk at that point to make fun of it."  In
general, the employees "wanted to know if [plaintiff] performed the
acts that were listed on the bathroom wall."  Plaintiff's co-workers
asked her such questions as "Do you really do things like that?", "Is
that how you got your job?" and "Did you fuck your way to the top?"
(6) In July of 1994, Ron Thurston . . . "again started in with his
'what made me hot' comments and--and telling [plaintiff] how good
[she] looked, [she] looked good enough to eat."  Mr. Thurston
"[i]nformed [plaintiff] that he had had his wife shave his crotch
because she ended up with pubic hair in her teeth," and made other
comments "of that nature." (7) On August 18, plaintiff endured more
"verbal abuse" from Thurston:  "Mr. Thurston had started in with
more of his comments about my body and what made me hot, what
turned me on.  Those were his favorite questions to ask me.  If I
could suck a golf ball through a garden hose at 150 feet.  He

> discussed blow jobs, things he did to his wife.  Just things of that nature."

Baty, 985 F. Supp. at 992 (alterations modified) (footnotes omitted).

### III.  Willamette's Response

In response to these incidents, Willamette took the following action:  After being told by Mr. Elliot that there was graffiti concerning herself and Mr. Elliott, Ms. Baty reported this fact to Dale McGinnis, who told her "it would be taken care of."  Appellee's Supp. App. Vol. I at 65.  In April 1994, when Ms. Baty complained about Mr. Harper's "bouncing Betty" comments, Mr. Harper was told to apologize to Ms. Baty.  On July 8, 1994, Willamette management was told that more graffiti concerning Ms. Baty had appeared on the men's bathroom wall.  Willamette contacted a handwriting expert that day, and, over the next month, the company collected four handwriting samples by placing metal plates over the graffiti, and then removing them and replacing them with fresh plates once they were written on.  The handwriting samples of graffiti, along with the job applications of eighty-four male hourly employees, were then sent to a handwriting expert for analysis.  The authors of the graffiti were never identified.

In early July 1994, Willamette's toll-free hot-line received an anonymous call complaining about sexual harassment at the Kansas City plant.  Regional Personnel Manager Jim Mertes and his assistant, Jean Wolfe, went to the plant to

investigate. On July 14 and 15, Mr. Mertes and Ms. Wolfe spoke with every female employee at the plant, including Ms. Baty, with whom they met at a nearby hotel at Ms. Baty's request. Ms. Baty testified she informed Mr. Mertes and Ms. Wolfe of the incidents of sexual harassment. [2]

Mr. Mertes left Kansas City, and returned in late July for four days of continued investigation into Ms. Baty's complaints and to conduct sexual harassment training. Mr. Mertes spoke with every male employee about whom Ms. Baty had complained, and all either denied the particular conduct or stated that Ms. Baty was a willing participant. Mr. Mertes conducted two 45-minute sexual harassment training sessions, one for management and one for non-management employees. Mr. Mertes instructed the employees on sexual harassment law, gave examples of sexual harassment, and showed a video. He reminded everyone that Willamette would not tolerate sexual harassment, and that such conduct would be severely punished, including by termination. After conducting his investigation, Mr. Mertes concluded that no sexual harassment had in fact occurred. This finding was communicated to Ms. Baty. No Willamette employee was ever disciplined in connection with Ms. Baty's allegations.

---

[2]Mr. Mertes testified that Ms. Baty reported only a few incidents of harassment. Appellee's Supp. App. Vol. II at 623-24.

Willamette has a written policy prohibiting sexual harassment.  Ms. Baty and other Willamette employees testified that they never saw it, or received training on it, until Mr. Mertes' visit in July 1994.  Mr. Lankard testified that it was posted on a bulletin board in the factory in February 1992.  Mr. Brown testified that a compliance manual including information about Willamette's sexual harassment policy was distributed at a voluntary all-plant meeting in January 1994.  Appellee's Supp. App. Vol. II at 515, 568-69.  He also testified, however, that prior to July 1994, he had "never received any training on how to investigate a complaint of sexual harassment."  Appellee's Supp. App. Vol. III at 910.  Mr. Elliott testified that even after the sexual harassment training by Mr. Mertes, he still did not understand what sexual harassment was.  Appellee's Supp. App. Vol. I at 253.

The oil room graffiti was reported to management on August 18, 1994.  Ms. Baty testified that general manager Gary Brown was "genuinely concerned" and "embarrassed" about the graffiti, and he apologized to Ms. Baty and told her the  perpetrator would be disciplined "up to and including termination."  Appellee's Supp. App. Vol. I at 132-33, 168-69.  Mr. Brown and Ms. Baty called the Kansas City Police Department, Mr. Brown interviewed three employees who may have been in the oil room, and the oil room was torn down shortly after the graffiti incident.

Also on August 18, Ms. Baty reported to Mr. Brown that Mr. Thurston had made unwelcome comments to her.  Mr. Brown talked with Mr. Thurston that day, and Mr. Thurston denied all comments except the one concerning the golf ball, which he claimed he made because Ms. Baty had made a similar statement to him some months before.  On August 22, Mr. Brown, Ms. Baty, Mr. Thurston and the Union president met to discuss Ms. Baty's allegations.  Mr. Thurston denied making the comments, and Mr. Brown told Ms. Baty and Mr. Thurston to be polite, to keep their conversations strictly to business matters, and that Ms. Baty should immediately report any problems.  Appellee's Supp. App. Vol. II at 548.  Mr. Brown testified he received no further complaints from Ms. Baty about Mr. Thurston.   Id. at 548-49.

In September 1994, someone tore off a plate in the men's bathroom, thereby exposing some graffiti written earlier.  No further graffiti appeared.

On November 21, 1994, Ms. Baty met with Mr. Brown and Dale McGinnis and was told that her employment was terminated.  Ms. Baty testified that Mr. Brown told her that she had been promoted to the supervisor trainee position in April in anticipation that she would fill Carl Lankard's position, since Mr. Lankard planned to retire at the end of the year.  Appellee's Supp. App. Vol. I at 141.  Mr. Lankard had decided not to retire, however, so there was no

position for Ms. Baty to fill. [3] Moreover, she testified she was told that production at the plant was expected to decline in the next year because of a world-wide paper shortage, and the plant could not afford her salary. Id. As it turns out, while production decreased somewhat, prices and revenues increased in 1995. Appellee's Supp. App. Vol. II at 555-58. All employees received a bonus. Moreover, the 1995 plant budget, approved by Dale McGinnis and others three days before Ms. Baty's termination, projected increased production. No other Willamette employee was terminated because of the anticipated paper shortage. Id. at 576.

Ms. Baty testified that the incidents of sexual harassment caused her embarrassment and humiliation, and caused her to suffer headaches, weight fluctuations, and crying episodes. Appellee's Supp. App. Vol. I at 143. She testified that the male employees at Willamette made her "day-to-day life hell." Id. at 142. She presented testimony from a psychologist, Dr. Irma Rahtjen, that she suffered from post-traumatic stress disorder beginning approximately in late spring or early summer 1994 and continuing until at least August 1996.

After receiving her notice of right to sue from the EEOC, Ms. Baty instituted this action against Willamette, alleging sexual harassment and

---

[3]In fact, Ms. Baty testified that she knew in March, before she accepted the promotion, that Mr. Lankard was not in fact going to retire. Appellee's Supp. App. Vol. I at 142.

- 12 -

retaliation in violation of Title VII, as well as state law negligence claims. Willamette filed a motion for summary judgment, which the district court granted with respect to Ms. Baty's state law claims and denied with respect to her Title VII claims. The Title VII claims were then tried to a jury. At the close of evidence, Willamette moved for judgment as a matter of law, which the district court denied except that it ruled Ms. Baty had failed to prove a "continuing violation" and would therefore not be permitted to recover damages for sexual harassment occurring before June 16, 1994.

The jury returned its verdict for Ms. Baty, awarding her: (1) compensatory damages of $120,000 and punitive damages of $500,000 for sexual harassment; and (2) compensatory damages of $25,000, punitive damages of $500,000, back pay of $40,000 and front pay of $165,000 for retaliation. Willamette renewed its motion for judgment as a matter of law or, alternatively, for a new trial or remittitur. The court denied the motion in large part, finding the evidence sufficient to support the jury's verdict on both sexual harassment and retaliation and sufficient to support the award of damages. In so ruling, the court noted that it "found plaintiff to be a very credible witness; a distinct lack of credibility, on the other hand, predominated among defendant's witnesses." Baty, 985 F. Supp. at 997.

The court did, however, reduce the jury's separate awards of compensatory and punitive damages for the sexual harassment and retaliation claims to a single "capped" award of $300,000, based upon its interpretation of 42 U.S.C. § 1981a. It also vacated the jury's awards of back and front pay, holding that those are properly determined by the court, not the jury, and entered lesser amounts of $38,063 in back pay and $22,420 in front pay. These appeals followed.

Willamette argues: (1) its prompt and effective remedial action stopped the sexual harassment, thereby precluding a finding of liability as a matter of law; (2) alternatively, it took reasonable steps to end the sexual harassment; (3) the evidence failed to show retaliation; (4) the evidence was insufficient to support awards of compensatory or punitive damages; (5) alternatively, the awards of compensatory and punitive damages were excessive; (6) the judgment violates the First Amendment; and (7) alternatively, the case should be reversed and remanded for a new trial because of various prejudicial errors.

On cross-appeal, Ms. Baty argues: (1) the evidence is sufficient to support both a hostile work environment sexual harassment and a retaliation claim; (2) the evidence is sufficient to support separate awards for compensatory and punitive damages; (3) she is entitled to separate "capped" awards of $300,000 each for her sexual harassment and her retaliation claims; (4) the district court did not abuse its discretion in denying remittitur or a new trial; (5) the First Amendment does

not shield Willamette from intentional discrimination or retaliation; and (6) the district court did not abuse its discretion in its rulings on jury instructions or admission of evidence, except it should have found a "continuing violation." The Center for Individual Rights, as amicus curiae in support of Willamette, urges reversal of the district court's judgment on the ground that Willamette employees engaged in protected First Amendment activity, and because Title VII harassment laws, in general and particularly as applied in this case, are too vague.

## DISCUSSION

The district court granted in part and denied in part Willamette's motion for judgment as a matter of law or, alternatively, for a new trial or remittitur. "We review de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as the district court." Wilson v. Tulsa Junior College , 164 F.3d 534, 536 (10th Cir. 1998). Such a judgment "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Mason v. Oklahoma Turnpike Auth. , 115 F.3d 1442, 1450 (10th Cir. 1997). "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for [those] of the jury. However, we must enter judgment as a matter of law in favor of the moving party if 'there is no legally sufficient evidentiary basis . . . with respect to a claim

or defense . . . under the controlling law.'" Harolds Stores, Inc. v. Dillard Dep't Stores , 82 F.3d 1533, 1546-47 (10th Cir. 1996) (citation omitted) (quoting Fed. R. Civ. P. 50(a)).  We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party.  See Wolfgang v. Mid-America Motorsports, Inc. , 111 F.3d 1515, 1522 (10th Cir. 1997).

"A district court's denial of a motion for a new trial is reviewed for an abuse of discretion."  Skaggs v. Otis Elevator Co. , 164 F.3d 511, 514 (10th Cir. 1998).  We will reverse the district court only if it "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Weese v. Schukman , 98 F.3d 542, 549 (10th Cir. 1996).  We review the disposition of a motion for remittitur for "manifest abuse of discretion." Vining v. Enterprise Fin. Group, Inc. , 148 F.3d 1206, 1216 (10th Cir. 1998).

## I.  Hostile Work Environment

Willamette does not seriously dispute that the conduct of its employees and certain supervisory personnel created a hostile work environment. [4]  It argues,

---

[4]Willamette states it "does not concede the post-June 16 language and behavior establishes a hostile working environment.  To the contrary, Willamette emphatically asserts the post-June 16 language and behavior were not sufficiently severe or pervasive to establish a hostile working environment."  Willamette's Br. at 23 n.26.  However, other than this statement, Willamette makes no specific argument refuting the finding of a hostile work environment.  In any event, we

(continued...)

- 16 -

however, that it either effectively stopped the harassment, or at least took reasonable steps to stop the harassment, thereby precluding liability.

The Supreme Court has recently clarified the standards governing employer liability for the creation of a hostile work environment. An employer may be liable directly or vicariously. An employer is directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment. "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2267 (1998); see also Harrison v. Eddy Potash, Inc., 158 F.3d 1371, 1374-75 (10th Cir. 1998). Ms. Baty alleges Willamette knew or should have known about the harassment.[5] Willamette argues its response in the face of such knowledge was adequate.

Further, an employer is vicariously liable for a supervisor's creation of a hostile work environment, subject to the affirmative defense "that the employer

---

[4](...continued)
conclude sufficient evidence supports the finding that a hostile work environment existed both before and after June 16, 1994.

[5]Ms. Baty argues, without objection by Willamette, that the knowledge of plant manager Dale McGinnis, plant superintendent Ralph McGinnis, general manager Gary Brown and regional personnel manager Jim Mertes may all be imputed to Willamette. See Harris v. L & L Wings, Inc., 132 F.3d 978, 982 (4th Cir. 1997) ("[Defendant employer] was put on notice of the harassment [plaintiffs] experienced by repeated, specific complaints that [plaintiffs] made to several managers.").

exercised reasonable care to prevent and correct promptly any sexually harassing behavior."  Burlington , 118 S. Ct. at 2270;  see also  Wilson v. Tulsa Junior College , 164 F.3d 534, 540 n.4 (10th Cir. 1998).

Ms. Baty has alleged both direct and vicarious liability.  She alleges that co-employees harassed her, and Willamette knew or should have known about the harassment but failed to stop it.  She also alleges that her supervisors harassed her and Willamette failed to exercise reasonable care to stop it.  However, because the district court correctly limited her to damages for conduct occurring post-June 16, 1994 and because that conduct basically involved co-employee harassment, we focus our analysis on vicarious liability.  Since it is clear that Willamette management knew about the co-employee harassment, we evaluate Willamette's response to the harassment allegations to determine whether it took reasonable action to stop the harassment or if, in fact, it effectively did stop it.

We agree with the district court that "there was sufficient evidence by which a reasonable jury could have concluded that [Willamette's] response was inadequate."  Baty , 985 F. Supp. at 994.  We further agree with the district court's reasoning:

> Throughout the course of her employment with defendant, plaintiff
> made numerous complaints to supervisors and other management
> personnel about harassment of her; accordingly, defendant knew, or
> at least should have known, that a serious harassment problem
> existed at the Kansas City plant.  Moreover, plaintiff presented
> evidence of defendant's lackadaisical attitude towards the harassment

- 18 -

occurring within its walls, indicating that management condoned and even encouraged the creation of a hostile work environment for plaintiff, especially given plaintiff's complaints about harassment by her supervisors. Specifically, the jury could reasonably have concluded that the small amount of training given the employees was inadequate in light of the severity of the problem. The jury could also have reasonably found that the investigation conducted by defendant was a sham given the investigators' conclusion that no harassment had taken place at the plant and defendant's refusal to discipline any of its employees.

Id. (footnote omitted).

Willamette relies heavily on Adler v. Wal-Mart Stores, Inc., 144 F.3d 664 (10th Cir. 1998), to support its argument that its response to Ms. Baty's claims of harassment was adequate to insulate it from liability. In Adler, however, the employer investigated the harassment and then took prompt and specific disciplinary action against two offending employees. By contrast, the evidence supports the district court's observation that Willamette's investigation could reasonably be regarded as a sham, especially where no Willamette employee was ever disciplined, even minimally. While we do not suggest that disciplinary action is always required to establish the adequacy of the employer's response, it obviously is relevant to our analysis of the adequacy of that response. Cf. Harris v. L & L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997) ("'[A]n employer, in order to avoid liability for the discriminatory conduct of an employee, does not have to necessarily discipline or terminate the offending employee as long as the employer takes corrective action reasonably likely to prevent the offending

conduct from reoccurring.'") (quoting Knabe v. Boury Corp., 114 F.3d 407, 414 (3d Cir. 1997)). Ample evidence supports the jury's conclusion that Willamette neither effectively stopped nor took reasonable steps to end the sexual harassment. We therefore affirm the district court's denial of Willamette's motion for judgment as a matter of law on Ms. Baty's sexual harassment claim.

## II. Retaliation

"To prevail on a retaliatory discharge claim, a plaintiff must establish that the decision to terminate her resulted from retaliatory animus." Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 549 (10th Cir. 1999). In the absence of direct evidence of discrimination, the "familiar framework" of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), governs. Medlock, 164 F.3d at 549-50. Thus, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the defendant is able to articulate a legitimate nondiscriminatory reason for the adverse action, the plaintiff must then show that the articulated reasons are a pretext for retaliation." Id. at 549-50. "Following a full trial on the merits, the issue is whether [the plaintiff] presented sufficient evidence for the jury to determine that adverse employment action was taken against him in response to the protected activity." Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1103 (10th Cir. 1998).

Willamette argues the evidence failed to support the jury's finding of retaliation. The district court rejected this argument, as do we:

> [T]here was ample evidence before the jury that the reasons given plaintiff for her termination were pretextual. Plaintiff testified that, when she was terminated, she was told that she had been hired to replace a particular supervisor, who had not retired as planned; there was evidence, however, that defendant knew of the delay in this employee's retirement before it hired plaintiff in April of 1994.
>
> There was also ample evidence that defendant's paper-shortage rationale was a mere pretext for retaliation. For instance, just before plaintiff's termination, defendant's budget actually projected _increased_ production. Plaintiff was told that defendant would not be able to pay her salary in 1995, but the plant made more money that year than in the previous year, and all employees received bonuses. Plaintiff was the only employee let go, despite being a capable employee. Defendant also advertised job openings for production work soon after plaintiff's termination.

Baty, 985 F. Supp. at 995. We therefore affirm the district court's denial of Willamette's motion for judgment as a matter of law on Ms. Baty's retaliation claim.

### III. Damages

### A. Compensatory Damages

Willamette argues the evidence was insufficient to support an award of any amount of compensatory damages. Title VII, as amended in 1991, permits the recovery of compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses."

42 U.S.C. § 1981a(b)(3). An award of damages "must be supported by substantial evidence." Wulf v. City of Wichita, 883 F.2d 842, 874 (10th Cir. 1989).

In upholding the award of compensatory damages, the district court relied upon Ms. Baty's testimony "that she felt upset, frustrated, humiliated, and embarrassed; that she felt resentment from other employees, including management personnel; that she experienced stress, headaches, and weight fluctuations; that she found it difficult to do her work; and that the harassment had generally 'made [her] life hell.'" Baty, 985 F. Supp. at 995-96. The district court also relied upon the testimony of Ms. Baty's psychological expert to the effect that she suffered post-traumatic stress disorder as a result of the harassment and termination. Id. at 996. We agree that this evidence supported the jury's award of compensatory damages. See Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1416-17 (10th Cir. 1997) (holding that plaintiff's testimony about, inter alia, "nausea, migraines, humiliation, degradation, loss of self-respect, sleeplessness, consumption of sleeping pills, [and] frequent crying" constituted "substantial evidence" which supported compensatory damage award, even in absence of testimony of treating physician or psychologist).

Willamette argues that the court failed to distinguish between pre-June 16, 1994 and post-June 16, 1994 damages. However, Ms. Baty presented evidence that her injuries continued beyond June 16, 1994, the commencement of the

period for which damages were compensable. As the district court observed, "the jury could reasonably have concluded that [she] suffered compensable injury after that date." Baty, 985 F. Supp. at 996.

### B. Punitive Damages

Willamette also argues that evidence was insufficient to support an award of punitive damages. A Title VII plaintiff may receive punitive damages if he or she demonstrates that the defendant "'engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his or her] federally protected rights.'" Medlock, 164 F.3d at 551 (quoting 42 U.S.C. § 1981a(b)(1)). We have acknowledged that we have "not had occasion to determine comprehensively what burden a plaintiff must carry to prove 'malice or reckless indifference to . . . federally protected rights' within the meaning of

§ 1981a(b)(1)." Medlock , 164 F.3d at 551. [6] However, we need not make such a determination in order to find that Ms. Baty carried her burden in this case.

We have held that Ms. Baty produced sufficient evidence that she was the victim of a hostile work environment and of retaliation, in violation of Title VII. Even assuming that Ms. Baty must show something more than merely intentional discrimination under Title VII, see Kolstad v. American Dental Assoc., 139 F.3d 958, 969 (D.C. Cir.) (en banc), cert. granted, 119 S. Ct. 401 (No. 98-208), cert. denied, 119 S. Ct. 408 (1998), we agree with the district court that there was

---

[6] While we have declined to specify the standard applicable for finding that a defendant acted with "malice or reckless indifference to [the plaintiff's] federally protected rights" so as to warrant an award of punitive damages, the D.C. Circuit recently ruled en banc that "egregious discriminatory conduct" is required–i.e., something more than simply a showing of intentional discrimination under Title VII. See Kolstad,139 F.3d at 969 ; see also Ngo v. Reno Hilton Resort Corp., 140 F.3d 1299, 1304 (9th Cir. 1998) (requiring "evidence of conduct more egregious than intentional discrimination" for Title VII punitive damages); Harris v. L & L Wings, Inc., 132 F.3d 978, 982 (4th Cir. 1997) (holding that "[p]unitive damages are an extraordinary remedy . . . for egregious cases"); Emmel v. Coca-Cola Bottling Co., 95 F.3d 627, 636 (7th Cir. 1996) (stating that punitive damages standard is a "higher hurdle" than that for underlying discrimination); Karcher v. Emerson Elec. Co., 94 F.3d 502, 509 (8th Cir. 1996) (making a similar holding); Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1216 (6th Cir. 1996) (same); McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 508 (1st Cir. 1996) (same). But see Luciano v. Olsten Corp., 110 F.3d 210, 219-20 (2d Cir. 1997) (finding no additional evidence needed for punitive damages).

The Supreme Court has granted certiorari in Kolstad on the issue of "[i]n what circumstances may punitive damages be awarded under Title VII . . . for unlawful intentional discrimination?" Kolstad v. American Dental Ass'n, 119 S. Ct. 401, 67 U.S.L.W. 3291 (1998) (No. 98-208).

sufficient evidence of Willamette's "malice or reckless indifference" to warrant a punitive damages award:

> Plaintiff presented evidence from which a reasonable jury could have inferred that management did not really respond to plaintiff's complaints, despite knowledge of serious problems with harassment; that defendant conducted a sham investigation to appease plaintiff and other victims of harassment at the plant; and that management employees actually condoned the harassment. Accordingly, a reasonable jury could have found that defendant acted with malice or reckless indifference with respect to the sexual harassment of plaintiff.
>
> The court also concludes that the evidence was sufficient to support a punitive damage award on plaintiff's claim of retaliation. The jury could reasonably have inferred malice or reckless indifference from the evidence of resentment of plaintiff by management after the investigation and what could be viewed as patently false reasons given to plaintiff at the time of her termination.

Baty, 985 F. Supp. at 996. The evidence therefore supports the jury's award of punitive damages.

### C. Excessive Total

Willamette argues that, although the district court reduced the damages awarded to $300,000, in accordance with the cap of § 1981a, the award of $300,000 for both compensatory and punitive damages is still excessive. We disagree. Both sides refer us to "comparable" cases, Willamette arguing that they demonstrate the award is excessive, and Ms. Baty arguing that they demonstrate

that the award is within the normal range. When reviewing an award for excessiveness we consider whether the damage award "shock[s] the . . . judicial conscience." Smith, 129 F.3d at 1417. We hold that the award in this case is not excessive; it by no means "shocks the conscience," given the facts of this case. See, e.g., id. (upholding compensatory damage award of $200,000, the statutory cap).

### D. Section 1981a Damage Award Cap

In her cross-appeal, Ms. Baty argues the district court erred in combining her separate damages awards for sexual harassment and for retaliation into a single award "capped" at $300,000, pursuant to 42 U.S.C. §1981a. Section 1981a states that "[i]n an action brought by a complaining party under [Title VII] . . . the complaining party may recover compensatory and punitive damages as allowed in subsection (b) . . . ." 42 U.S.C. 1981a(a)(1). Subsection (b) provides that "[t]he sum of the amount of compensatory damages . . . and the amount of punitive damages awarded under this section[] shall not exceed, for each complaining party– . . . in the case of a respondent who has more than 500 employees . . . $300,000." 42 U.S.C. § 1981a(b)(3)(D). Ms. Baty argues the statute contemplates a $300,000 cap per *claim*, as opposed to per plaintiff or per law suit. Thus, she argues her sexual harassment claim and her retaliation claim should

each be capped at $300,000, for a total of $600,000. She points out that the EEOC interprets the statute that way, and she urges us to follow the EEOC.

As Willamette argues, we need not defer to the statutory interpretation adopted by an administrative agency unless the statutory language is ambiguous. See Mt. Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997) ("If a statute is clear and unambiguous, the court must interpret the statute to effect the unambiguous intent of Congress, regardless of the interpretation given to the statute by an administrative agency with responsibility for enforcement."). We find no ambiguity in this case.

A "familiar canon of statutory construction is that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); see also Owen v. Magaw, 122 F.3d 1350, 1354 n.1 (10th Cir. 1997). The statute plainly states that "[i]n an action brought by a complaining party . . . the complaining party may recover compensatory and punitive damages" in a sum not to exceed " for each complaining party . . . $300,000." 42 U.S.C. § 1981a (emphasis added). We agree with the Sixth Circuit:

> Under the plain language of the statute, the cap on compensatory damages applies to each complaining party in an "action." An

- 27 -

"action" is simply a "lawsuit brought in court." Similarly, the Federal Rules of Civil Procedure use the term "action" or "civil action" to describe all claims for relief alleged in a single lawsuit. Put simply, the § 1981a caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise.

Hudson v. Reno, 130 F.3d 1193, 1200 (6th Cir. 1997) (citations omitted); see also Smith v. Chicago Sch. Reform Bd. of Trustees, 165 F.3d 1142, 1149-51 (7th Cir. 1999) (following Hudson); Hall v. Stormont Trice Corp., 976 F. Supp. 383, 385-86 (E.D. Va. 1997); Krahel v. Owens-Brockway Glass Container, Inc., 971 F. Supp. 440, 455-56 (D. Or. 1997); cf. Muller v. Costello, 997 F. Supp. 299, 303 (N.D.N.Y. 1998) (citing Hudson and applying same rule to ADA case). The district court correctly capped Ms. Baty's claims at $300,000 for the sexual harassment and the retaliation claims together.

## IV.  First Amendment

Willamette argues that the hostile work environment sexual harassment judgment is "based exclusively on offensive workplace speech." Willamette's Br. at 40. It argues that such speech would be protected by the First Amendment had it occurred outside the workplace, so imposing liability on the employer for such speech in the workplace violates the First Amendment.

The district court dismissed this argument, noting that the Supreme Court has rejected it in general terms when it observed that "[i]n Hishon [v. King &

- 28 -

Spalding , 467 U.S. 69 (1984)], we rejected the argument that Title VII infringed

employers' First Amendment rights[, a]nd more recently, in        R.A.V. v. St. Paul   ,

505 U.S. [377,] 389-390 [(1992)], we cited Title VII . . . as an example of a

permissible content-neutral regulation of conduct."        Wisconsin v. Mitchell   , 508

U.S. 476, 487 (1993).

The district court also followed the reasoning of      Robinson v. Jacksonville

Shipyards, Inc.   , 760 F. Supp. 1486 (M.D. Fla. 1991), one of the very few cases to

directly address the issue, and the only detailed judicial explanation for rejecting

the argument that application of Title VII may contravene the First Amendment.

The Robinson  court held that imposing Title VII liability on an employer for

failing to regulate its employees' harassing speech does not violate the First

Amendment for the following reasons:  (1) the employer does not seek to express

itself through the speech of its employees; (2) the speech in question amounts to

discriminatory conduct, not just speech; (3) regulation of discriminatory speech in

the workplace is simply a time, place and manner regulation of speech;

(4) workers are a captive audience; (5) Title VII is a narrowly drawn regulation

serving a compelling governmental interest; and (6) analogizing to public

employee speech cases, a court "may, without violating the first amendment,

require that a private employer curtail the free expression in the workplace of

some employees in order to remedy the demonstrated harm inflicted on other

employees." Robinson, 760 F. Supp. at 1534-36. [7] Ms. Baty adopts these arguments.

We agree with the district court that the judgment entered against Willamette does not infringe on the First Amendment rights of Willamette or its employees. We note that the Supreme Court has strongly suggested that Title VII, in general, does not contravene the First Amendment. We further agree with the reasoning of the Robinson court in support of that conclusion in the context of a sexual harassment action like Ms. Baty's. We accordingly decline to hold that the judgment against Willamette violates the First Amendment.

## V. Continuing Violation

Ms. Baty also cross-appeals the district court's judgment as a matter of law for Willamette, finding Ms. Baty failed to prove a "continuing violation" and

---

[7]Another district court, with more abbreviated reasoning, also rejected the argument that Title VII runs afoul of the First Amendment. "Title VII may legitimately proscribe conduct, including undirected expressions of gender intolerance, which create an offensive working environment. That expression is 'swept up' in this proscription does not violate First Amendment principles." Jensen v. Eveleth Taconite Co., 824 F. Supp. 847, 884 n.89 (D. Minn. 1993).

While there are very few cases actually discussing this issue, although the issue is potentially relevant to many Title VII sexual harassment cases, there is considerable academic commentary, expressing a wide range of views as to the existence and scope of any conflict between Title VII harassment law and the First Amendment. See generally Cynthia L. Estlund, Freedom of Expression in the Workplace and the Problem of Discriminatory Harassment, 75 Tex. L. Rev. 687 (1997).

therefore could not recover any damages for alleged harassment occurring before June 16, 1994, the date 300 days prior to her filing an administrative charge with the EEOC. However, Ms. Baty requests that we "reverse the district court's ruling that she did not establish a 'continuing violation' only in the event [we] reverse[] the sexual harassment verdict and that reversal adversely affects the amount of the final judgment." Ms. Baty's Main Br. at 49 n.32. Because we have not reversed the sexual harassment verdict, we do not address Ms. Baty's continuing violation claim.

## VI. Prejudicial Error

Finally, Willamette argues, alternatively, that the district court's judgment should be reversed and the case remanded for a new trial because of "prejudicial error." The claimed errors are: (1) allowing testimony concerning incidents occurring prior to June 16, 1994, and giving jury instruction No. 17 in connection therewith; (2) permitting the testimony of Willamette employee Sheila Summers; and (3) failing to give a jury instruction on the basis of Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1538 (10th Cir. 1995). Willamette argues these errors, either individually or collectively, were so prejudicial as to warrant a new trial.

"We review the district court's decision to give or not give a particular instruction for abuse of discretion." McCue v. Kansas Dep't of Human

<u>Resources</u>, 165 F.3d 784, 787 (10th Cir. 1999). We similarly review "a district court's decision to admit or exclude evidence for abuse of discretion." <u>Id.</u> at *3. When a party seeks "reversal of a jury verdict or of a denial of a motion for new trial" by claiming trial errors, it "must establish the alleged trial errors were both prejudicial and clearly erroneous." <u>Gust v. Jones</u>, 162 F.3d 587, 591 (10th Cir. 1998).

## A. Pre-June 16, 1994, Incidents

As indicated, unless Ms. Baty established that the pre-June 16, 1994, incidents were part of a "continuing violation" involving sexual harassment, she was not entitled to seek compensation for such incidents because they fell outside the limitations period applicable to her Title VII claim. [8] The district court

---

[8]"The continuing violation doctrine permits a Title VII plaintiff to challenge incidents that occurred outside the statutory time limitations of Title VII if such incidents are sufficiently related and thereby constitute a continuing pattern of discrimination." <u>Hunt v. Bennett</u>, 17 F.3d 1263, 1266 (10th Cir. 1994). We consider the following to determine whether a continuing violation has occurred: "(i) subject matter–whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence–whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." <u>Martin v. Nannie & the Newborns, Inc.</u>, 3 F.3d 1410, 1415 (10th Cir. 1993). The continuing violation doctrine "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." <u>Id.</u> at 1415 n.6.

nonetheless permitted testimony as to such incidents, and rejected Willamette's

argument that such admission was error, for three reasons: (1) when Ms. Baty

presented such evidence, her "continuing violation" claim was still viable, since

the court did not rule on it until the close of evidence; (2) such evidence was

admissible in any event to establish (i) Willamette's knowledge of the harassment;

(ii) the unreasonableness of Willamette's response to the post-June 16

harassment; (iii) that Ms. Baty's complaints were in good faith for purposes of

her retaliation claim; and (iv) Willamette's retaliatory motive in terminating Ms.

Baty; and (3) the court instructed the jury that it could only award damages for

post-June 16 conduct. [9] We agree and find no error in the district court's

admission of that evidence. [10]

---

[9]Willamette's counsel in closing argument called the jury's attention to the fact that Ms. Baty was limited to damages for post-June 16 conduct. Appellee's Supp. App. Vol. III at 812-13.

[10]As long as Ms. Baty pursued a continuing violation theory, such evidence was obviously relevant. See Martin, 3 F.3d at 1415-16. Moreover, as the district court noted, we have held that it is error not to admit such evidence as relevant background. See Noland v. McAdoo, 39 F.3d 269, 271-72 (10th Cir. 1994); see also Rorie v. United Parcel Serv., 151 F.3d 757, 761 (8th Cir. 1998) ("Even if a plaintiff is unable to show a continuing violation . . . we have held that instances of harassment occurring outside the [statutory] period may be admissible to provide relevant background to later discriminatory acts."). And, such evidence may be admissible to show that Willamette had notice of the harassment but failed to take action. See West v. Philadelphia Elec. Co., 45 F.3d 744, 748 (3d Cir. 1995) ("The statutory limitations period is not . . . necessarily a bar to the admissibility of pre-statute acts which bear on the work environment and on the employer's awareness of that environment."); Lockett v. West, 914 F. Supp. 1229,

(continued...)

### B. Sheila Summers' Testimony

Sheila Summers also worked at Willamette's Kansas City box plant. She was permitted to testify about several incidents when Ralph and Dale McGinnis made sexually-oriented comments and/or gestures towards her. She was also the subject of some graffiti in June and July 1994. When Jim Mertes contacted Gary Brown concerning the hot-line call in July 1994, Mr. Brown told Mr. Mertes that he believed Ms. Baty and Ms. Summers were responsible for the call. Ms. Summers was terminated in late August 1994. Ms. Summers testified about the circumstances surrounding her termination.

Willamette argues the district court erred in permitting Ms. Summers to testify concerning her termination, since that was not at issue in Ms. Baty's trial.

---

[10](...continued)
1234-35 (D. Md. 1995) (holding that evidence of time-barred act may be evidence of hostile work environment). In considering the continuing violation doctrine, the Supreme Court has said:

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977).

Finally, the district court gave the jury a limiting instruction explaining the purposes for which the jury could consider such evidence. We therefore perceive no prejudice to Willamette from the admission of the pre-June 16 incidents.

- 34 -

The court held it was admissible "to show that defendant terminated plaintiff in retaliation for complaining about sexual harassment." Baty, 985 F. Supp. at 997. We agree. See Coletti v. Cudd Pressure Control, 165 F.3d 767, 776 (10th Cir. 1999) ("The testimony of other employees about their treatment by the defendant employer is relevant to the issue of the employer's discriminatory intent if the testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motives."); Curtis v. Oklahoma City Pub. Schs. Bd. of Educ., 147 F.3d 1200, 1217 (10th Cir. 1998) (same).

## C. Instructional Errors

Willamette argues the district court erred in giving instruction No. 17, in connection with the admission of pre-June 16 evidence, and in failing to give a jury instruction "on the basis of Gross v. Burgaff [sic] Constr. Co., 53 F.3d 1531, 1538 (10th Cir. 1995)." Willamette's Br. at 44. We find no abuse of discretion in the district court's rulings with respect to these claimed instructional errors.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.