**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 19 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RHONDA MALLINSON-
MONTAGUE, JESSICA ROTOLA,

    Plaintiffs-Appellees and
    Cross-Appellants,

v.

JAMES POCRNICK,

    Defendant,

and

PROFESSIONAL BANK,

    Defendant-Appellant and
    Cross-Appellee.

No. 98-1275
No. 98-1297

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 95-WY-2969-AJ)

Ricardo M. Barrera, Special Counsel, (John N. McNamara, Jr., McNamara Law
Firm, P.C., Denver, Colorado, with him on the briefs) for Appellant.

Bruce P. Fierst, (Rodney G. Loomis, Special Counsel, Law Offices of Bruce P.
Fierst, P.C., Denver, Colorado, with him on the briefs) for Appellees.

Before **HENRY, LUCERO,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Professional Bank ("ProBank") appeals from a jury verdict and resulting judgment finding it liable for damages under Title VII for the sexual harassment of Rhonda Mallinson-Montague and Jessica Rotola (the "Plaintiffs") by James Pocrnick, the Plaintiffs' supervisor during their employ at ProBank. On appeal, ProBank asserts as follows: (1) it is entitled to judgment as a matter of law under the affirmative defense set forth by the Supreme Court in *Burlington Industries v. Ellerth*, 118 S. Ct. 2257 (1998) and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998); (2) the district court erred in instructing the jury that Pocrnick was the "alter ego" of ProBank; and (3) the district court erred in awarding attorney's fees to the Plaintiffs. On cross-appeal, the Plaintiffs assert the district court erred in concluding that they were not entitled to either front or back pay because the jury found against them on their constructive discharge claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and Federal Rule of Civil Procedure 54(b), this court **affirms** the district court in all respects.

## II. BACKGROUND

At all relevant time periods, Pocrnick was employed by ProBank as Senior Vice-President of Consumer Lending.  In that capacity, Pocrnick had the authority to hire and fire employees in the consumer lending department.  Pocrnick answered directly to the President of ProBank, Charlie Drummond, while Drummond answered directly to ProBank's Board of Directors.

Pocrnick first met Mallinson-Montague when he closed a consumer loan for her in 1994.  Despite the fact that Mallinson-Montague had no prior experience in the banking field, Pocrnick indicated that he thought she had a great personality and offered her a position as a loan officer at ProBank.  Pocrnick indicated that Mallinson-Montague would earn a base salary of $26,000, up to an additional $11,000 per year in potential commissions based on the number of loans closed, and the possibility of additional bonus money dependent on whether she met her goals and on ProBank's fiscal performance.  Although Mallinson-Montague had reservations about the job, Pocrnick assured her that he would "make sure that [she] was trained properly in sales" and that he would provide her the necessary leads to meet her loan goals.

Almost immediately after Mallinson-Montague began work at ProBank in July of 1994, Pocrnick began sexually harassing her.  On one illustrative occasion, for instance, Pocrnick paged Mallinson-Montague and instructed her to meet him at a park to go over business matters.  When she arrived at the

designated meeting place, Pocrnick immediately pressed himself against her, kissed her, and asked her if she could feel his erection. At trial, Mallinson-Montague testified that when she rebuffed these advances, Pocrnick retaliated against her in the following two particulars: (1) he began denying her the business leads he had earlier promised, which leads were necessary for her to meet her monthly sales goals; and (2) he began rejecting loans she originated, resulting, at a minimum, in the loss of a $15 commission for each denied loan and in the losses of performance bonuses. Despite the fact that ProBank had a sexual harassment policy in place during this time frame, Mallinson-Montague never took advantage of the policy to report Pocrnick.

Like Mallinson-Montague, Rotola was encouraged by Pocrnick to seek employment with ProBank. Pocrnick met Rotola while both were working at Colorado National Bank, although at separate branches. During a first encounter, Pocrnick asked Rotola out for dinner and drinks but she declined the invitation. After Pocrnick moved to ProBank, he contacted Rotola and offered her a job. After Rotola accepted the job in November of 1993, her experiences at ProBank were remarkably similar to those described by Mallinson-Montague. At trial, Rotola testified that Pocrnick began sexually harassing her soon after she began working with him. When Rotola rebuffed these advances, Pocrnick failed to carry through with his promises to provide business leads and loan training and began

disapproving Rotola's loans. Like Mallinson-Montague, Rotola failed to utilize ProBank's sexual harassment policy.

The Plaintiffs eventually contacted an attorney and that attorney sent a letter to ProBank President Drummond in January of 1995 informing him of the allegations of sexual harassment. Drummond initiated an internal investigation of the allegations and terminated all of Pocrnick's authority over the Plaintiffs. Although the Plaintiffs suffered no further instances of sexual harassment after they reported their allegations to Drummond, they found the working conditions at ProBank intolerable and eventually left the bank.

Plaintiffs thereafter brought this action alleging numerous violations of Title VII and state law. Prior to trial, the district court granted summary judgement to ProBank on all of the Plaintiffs' claims except those arising under Title VII. As to their Title VII claims, the district court allowed the Plaintiffs to proceed at trial under the following three theories: (1) *quid pro quo* sexual harassment; (2) hostile environment harassment; and (3) constructive discharge. At the close of evidence, the jury concluded the Plaintiffs had both proved that they were subject to sexual harassment while employed at ProBank, without specifying whether it was *quid pro quo* or hostile work environment harassment, but ruled against both on their constructive discharge claims. The district court entered judgment in conformity with the jury's verdict.

## III. ANALYSIS

**A. Appeal, No. 98-1275**

*1. Judgment as a matter of law under* Faragher *and* Burlington

As discussed at length by this court in *Harrison v. Eddy Potash, Inc.*, the Supreme Court's recent decisions in *Faragher* and *Burlington*

> provided much-needed clarification [in the Title VII arena] by specifically outlining the various avenues for imposing direct and vicarious liability on an employer for a supervisor's sexual harassment, and by establishing a general standard for imposing vicarious liability on an employer when a supervisor is alleged to have misused his or her delegated authority in sexually harassing a subordinate employee.

158 F.3d 1371, 1374 (10th Cir. 1998). In particular, in those cases the Supreme Court held as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. R. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. . . . No affirmative defense is available, however, when the supervisor's

harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 118 S. Ct. at 2292-93; *Burlington*, 118 S. Ct. at 2270.

On appeal, ProBank asserts that it is entitled to judgment as a matter of law under the newly-elucidated affirmative defense set out in *Faragher* and *Burlington*.[1] Although ProBank does not contest on appeal the Plaintiffs' claims that they suffered sexual harassment at the hands of Pocrnick, it asserts that: (1) the harassment did not rise to the level of a tangible employment action; (2) it took reasonable care, as evidenced by its antiharassment policy, to prevent and correct promptly any sexually harassing behavior; and (3) the Plaintiffs unreasonably failed to utilize the antiharassment policy. For their part, the Plaintiffs do not appear to contest that if the *Faragher/Burlington* affirmative defense is applicable, ProBank is entitled to judgment as a matter of law. They assert, however, that the defense is not available because they each suffered a tangible employment action. *See Faragher*, 118 S. Ct. at 2293; *Burlington*, 118 S. Ct. at 2270.[2]

---

[1]These decisions were both handed down by the Court after the trial in this case.

[2]The jury was instructed that Pocrnick was the alter ego of ProBank. As set forth below, this court concludes that Pocrnick is a sufficiently high-ranking managerial employee that the district court's alter ego instruction was appropriate under the particular, narrow facts of this case. *See supra* Section III.A.2. It is unclear whether the affirmative defense set forth by the Supreme Court in

(continued...)

ProBank is entitled to judgment as a matter of law under the *Faragher/ Burlington* affirmative defense "only if the evidence points but one way and is susceptible to no reasonable inferences supporting" the opposing party. *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1450 (10th Cir. 1997); *see also Baty v. Willamette Indus.*, 172 F.3d 1232, 1241 (10th Cir. 1999) ("We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party."). This court does not "weigh the evidence, pass on the credibility of witnesses, or substitute our conclusions for [those] of the jury." *Harolds Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1546 (10th Cir. 1996). Nevertheless, this court must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law" for the jury to find in favor of the non-moving party. Fed. R. Civ. P. 50(a). Accordingly, the sole question is whether, viewing the evidence at trial in the manner most favorable to the

---

[2](...continued)
*Faragher* and *Burlington* is even applicable when the harassment is perpetrated by an alter ego of the employer. *See Burlington Indus v. Ellerth*, 118 S. Ct. 2257, 2267-68 (1998) (noting that an alter ego theory of indirect liability was not at issue in the case and establishing the affirmative defense while discussing the parameters of the aided-in-the-agency-relationship standard set out in the Restatement (Second) of Agency § 219(2)(d)). Nevertheless, because the Plaintiffs have not raised this question and because the affirmative defense fails on the merits, this court need not address the question.

Plaintiffs, no reasonable juror could conclude that they had suffered a tangible employment action.

The evidence adduced at trial in this case, properly viewed, was sufficient to establish that the Plaintiffs were both subjected to tangible employment actions. At trial, the Plaintiffs testified that they operated under the following compensation structure: (1) each received a base salary that was not pegged to the production of loans; (2) each received a commission of $15 for each loan they originated if that loan closed; and (3) each was entitled to participate in bonus programs if they met their loan-origination goals. Accordingly, a substantial portion of the Plaintiffs' compensation was directly tied to their ability to originate and close loans.

In that regard, the evidence at trial demonstrates that shortly after they began working at ProBank, Pocrnick began repeatedly requesting sexual favors from the Plaintiffs. The Plaintiffs testified that Pocrnick indicated that they would meet their goals, and therefore get their commissions and bonuses, if they acceded to Pocrnick's request for sexual favors.[3] They further testified, without

_____

[3]For instance, Mallinson-Montague testified as follows about a particular incident of sexual harassment:

A. I finally pushed him away, so he quit kissing me. And he told me not to worry about it; that this was between us; and that I would make my goals. We had plenty of time to make the cold calls and meet the people that we were supposed to meet and just that he

(continued...)

contradiction, that Pocrnick had the absolute power to approve or disapprove their loans. For instance, Rotola testified that "Mr. Pocrnick always had control on whether we made our goals or not. No one else did. . . . Mr. Pocrnick, bottom line, had the final say on what was approved and what wasn't approved." Mallinson-Montague testified that "whatever happened in the loan department was [Pocrnick's] say." Finally, the Plaintiffs testified that after it became clear that they would continue rejecting his sexual advances, Pocrnick no longer provided them with leads and began disapproving their loans, thereby seriously diminishing their commissions and bonuses and placing their jobs in jeopardy.

---

[3](...continued)
would make sure that I was taken care of. And I told him–
      Q. What did he mean that you were taken care of?
      A. That I would hit my goals and that I would get leads.
Mallinson-Montague further testified as follows with regard to this same incident of harassment:
      Q. How may times do you think you heard him say that you'll owe me or you'll owe me big time?
      A. Oh, quite a few. I would say the more frequently I went into his office and checked numbers, the more frequently I would hear it. Any time I brought up the numbers on the board, it was brought up. . . .
      Q. You stated what you thought he meant when he said "You'll owe me. You'll owe me big time." How is it you feel that what he meant, that you would owe him sexual favors?
      A. I guess the correlation between that is from the first time he said it was at Inspiration Point after he pressed himself against me and kissed me and then told me that he would make sure that I made my goals, but I'd owe him, and so my correlation to that was that any time I wanted to hit my goals, that sex was obviously a–

Despite this testimony, ProBank asserts that the adverse employment actions suffered by the Plaintiffs are not sufficiently substantial or tangible under *Faragher/Burlington* to make ProBank responsible for Pocrnick's actions. *See* Appellant's Brief at 19-20 ("ProBank submits that as a matter of law disapproval of at best a few loan applications does not constitute a 'significant change in employment status' or 'a significant change in benefits . . . .'"). In contrast to ProBank's characterization of the testimony at trial, the Plaintiffs did not simply testify that a few of the loans they originated were denied. Instead, they testified that Pocrnick disapproved large numbers of their loans and that their compensation was significantly affected by the disapprovals.[4] Despite ProBank's

---

[4]For instance, Rotola testified as follows:

Q. Your were in the new office with the glass. What did [Pocrnick] do then? What was he doing to bother you?

A. We went into his office and he shut the door and started yelling at me about my sales and everybody in the whole office heard. He verbally screamed at me over my sales when, in fact, there was nothing I could do with my sales because I was still bringing in volume, but he was turning everything I brought in down.

So prior to what I was bringing in when I first started was the same things I was bringing in towards the end. Nothing had changed.

Q. And were they being approved at the beginning?

A. Yes, they were?

Q. And were they being approved toward the end?

A. No, they were not.

Q. Was there any change in criteria, banking regulations or anything as to why a loan would be approved at one time and then not afterwards?

(continued...)

[4](...continued)

A. No, just that I kept turning him down and that's why he kept turning my loans down.

Q. Were your leads drying up?

A. I had no leads.

Q. Did there come a point that you decided you couldn't take it any longer?

. . . .

A. I couldn't take any more because he was threatening me. That I had bought a new home and I bought a new car and he told me that either I basically played his game or I would lose my house, I would lose my car.

He said he was very upset with me, that I wasn't doing what I was supposed to be doing, bringing in the loans I was supposed to be bringing in. And I explained to him that I was and he wouldn't–like I said, he wouldn't approve anything. He was always threatening me with my house and car.

Mallinson-Montague testified in a similar vein:

Q. Did you find–I asked you if there was any correlation between your having rejected his advances and getting leads[,] I believe I asked you; is that right?

A. Correct.

Q. What was that correlation?

A. The more I rejected him and the less that I saw him, the less leads that I got.

Q. And how did that affect your income?

A. That affected my income greatly. I was still, of course, making my salary, but I wasn't hitting my goals. I would only get the $15 for the loans that did close and not–and they didn't add–my goals came nowhere close to what they had been in the past.

Q. Did you also find any correlation between you rejecting Mr. Pocrnick's advances and your loan applications being rejected by Mr. Pocrnick?

A. Yes. It seemed like on several different occasions there were loans that were good loans, that there was no reason that Mr. Pocrnick should decline these loans to these people and that it would get me so much closer to my goals and they wouldn't get

(continued...)

-12-

attempts to marginalize it, this testimony is clearly sufficient to find that Pocrnick's sexual harassment resulted in a significant change in the Plaintiffs' benefits through the reduction of their commissions and bonuses. *See Burlington*, 118 S. Ct. at 2268 ("A tangible employment action constitutes a . . . decision causing a significant change in benefits.").[5]

ProBank asserts that the testimony of the Plaintiffs should be discounted in favor of the testimony of Pat Webber, an employee of ProBank who preformed an analysis of the loan rejections after ProBank learned of Pocrnick's sexual harassment of the Plaintiffs. Webber stated in a written report and testified at trial that he agreed with ninety to ninety-five percent of Pocrnick's decisions regarding the rejection of loans originated by the Plaintiffs. ProBank's reliance on the testimony of Webber is seriously misplaced. To the extent that Webber's testimony conflicts with the testimony of the Plaintiffs, this court is not entitled to disregard the testimony of the Plaintiffs and grant ProBank judgment as a matter of law based on the contradictory testimony of Webber. *See Baty*, 172 F.3d at

---

[4](...continued)
approved. . . .

[5]In light of this court's conclusion that Pocrnick's disapproval of the Plaintiffs' loans based on their refusal to accede to his sexual demands is a tangible employment action, we need not decide whether Pocrnick's denial of business and consumer leads for those same reasons, either alone or in conjunction with the disapproval of loans, also constitutes a tangible employment action.

1241 ("We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party."); *Harolds Stores*, 82 F.3d at 1546 (noting that in determining whether a party is entitled to judgment as a matter of law, this court does not "weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for [those] of the jury").

In any event, the testimony of Webber is simply not that helpful to ProBank. Webber disagreed with, or could not explain, five to ten percent of Pocrnick's loan rejections. Even taking Webber's testimony as true, the jury was certainly entitled to infer that the unexplained loan rejections were based on the Plaintiffs' refusals to consent to Pocrnick's advances. Furthermore, on cross-examination, Webber acknowledged that the bulk of the rejection decisions with which he disagreed fell within the later periods of the Plaintiffs' employ at ProBank, that period after which they had each repeatedly rejected Pocrnick's sexual advances. This testimony is entirely consistent with the testimony of the Plaintiffs that Pocrnick began to reject more and more of their loans as they remained steadfast in their rejection of his sexual advances. ProBank is not entitled to judgment as a matter of law based on the testimony of Webber.

As a final matter, we reject ProBank's assertion that only those adverse employment actions amounting to a constructive discharge are sufficient to preclude the applicability of the *Faragher/Burlington* affirmative defense. If the

-14-

Supreme Court had intended such a rule it could have easily said so. Instead, it used the term "tangible employment action," a term, as noted by the Court itself, heavy with judicial gloss. *See Burlington*, 118 S. Ct. at 2268 ("At the outset, we can identify a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate. Every Federal Court of Appeals to have considered the question has found vicarious liability when a discriminatory act results in a tangible employment action."). In so noting, the Supreme Court cited and quoted this court for the following proposition: "'If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing . . . .'" *Id.* (quoting *Sauers v. Salt Lake County*, 1 F.3d 1122, 1127 (10th Cir. 1993) (further quotation omitted)). Although the Court was careful to note that the resultant economic injury must be "tangible," "significant," and/or "material," *id.* at 2268-69, it never even hinted that the injury must be of the magnitude necessary to support a constructive discharge claim. *See Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990) (noting that question on which constructive discharge cases turn is "whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign").

In fact, in elucidating the tangible-employment-action standard, the Supreme Court cited with approval the opinion of the Seventh Circuit in *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). *See Burlington*, 118 S. Ct. at 2268-69. The court in *Crady* specifically noted that the question of whether the plaintiff was constructively discharged was not at issue in the case. *See* 993 F.2d at 135 n.1. Instead, the sole question was whether the plaintiff had demonstrated a "materially adverse change in the terms and conditions of employment." *Id.* at 136. As did the Second Circuit in a recent case, we conclude it unwise to merge the Supreme Court's specific language in *Faragher* and *Burlington* into the general umbrella concept of "constructive discharge." *Cf. Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir. 1999) (holding that *Faragher/Burlington*'s "tangible employment action" is not synonymous with "constructive discharge" and noting that not all constructive discharges will satisfy the *Faragher/Burlington* standard), *cert. denied*, 120 S. Ct. 1959 (2000). It is sufficient to note that the evidence adduced in this case–Pocrnick disapproved substantial numbers of loans originated by the Plaintiffs because they would not submit to his sexual advances thereby adversely affecting their eligibility for commissions and bonuses–is sufficient to

demonstrate that the adverse employment action at issue here was significant, material, and tangible.[6]

*2. Alter ego instruction*

In instructing the jury on the Plaintiffs' claims of *quid pro quo* sexual harassment, the district court provided the following instruction:

> Defendant [ProBank] is a corporation. A corporation may only act through natural persons as its agents or employees and, in general, any employee of a corporation may bind the corporation by his or her actions done and statements made while acting within the scope of his or her employment. Where an employee such as Mr. Pocrnick serves in a supervisory position and exercises significant control over an employee's hiring, firing or conditions of employment, that individual operates as the alter ego of the employer, and the employer is liable for any unlawful employment practices of the individual even though what the supervisor is said to have done violates company policy.

ProBank asserts on appeal that the district court erred in giving the alter ego instruction, noting that Pocrnick's mere status as Plaintiffs' supervisor is not enough to render Pocrnick ProBank's alter ego. In fact, ProBank asserts that

---

[6]Nor is ProBank entitled to a new trial in which it can present the *Burlington* and *Faragher* defense. The *quid pro quo* instruction given in this case required the jury to conclude that Pocrnick's sexual harassment of the Plaintiffs resulted in a tangible job detriment. As set forth at length above, the actions of Pocrnick did deprive the Plaintiffs of a tangible job benefit. Furthermore, as set forth below, the alter ego instruction provided by the district court in this case was properly given. Finally, as to the Plaintiffs' hostile work environment claim, the jury was given the following affirmative defense instruction: "[ProBank] is not liable for the so-called 'hostile environment' claim of sexual harassment if it took prompt and appropriate corrective action with respect to [Pocrnick's] alleged actions once they became known by management of [ProBank]."

"Pocrnick's position as [P]laintiffs' supervisor, even with his authority to hire and fire them, does not make him ProBank's alter ego, and this Court should so rule as a matter of law." Appellant's Brief. at 30.

ProBank is certainly correct, as set out above in this court's discussion of *Faragher* and *Burlington*, that an employer is not automatically responsible for all sexual harassment perpetrated by its supervisory employees. *See Burlington*, 118 S. Ct. at 2267 (noting "general rule is that sexual harassment by a supervisor is not conduct within the scope of employment," but recognizing that "[s]cope of employment does not define the only basis for employer liability under agency principles"). What ProBank refuses to recognize, however, is that Pocrnick is more than simply one of ProBank's supervisory employees.

As the Supreme Court recognized in *Burlington*, an alter ego instruction is appropriate in those situations "where the agent's high rank in the company makes him or her the employer's alter ego." *Id.* Despite the absolute scarcity of case law development of this alternate avenue of employer liability, a review of the record reveals that this is one of those rare cases in which an alter ego instruction was appropriate based on Pocrnick's high rank at ProBank.[7] In that

[7]In its limited and conclusory briefing of this issue, ProBank simply asserts that this court should decide the alter ego issue in this case "as a matter of law." Appellant's Brief at 30. Our review of the record reveals that the testimony as to Pocrnick's managerial status at ProBank is undisputed and sufficient to allow this

(continued...)

-18-

regard, the evidence at trial demonstrates that during all relevant time periods, Pocrnick was employed by ProBank as Senior Vice-President of Consumer Lending. In that capacity, Pocrnick had the authority to hire and fire employees in the consumer lending department, was the ultimate supervisor of all employees in the department, and had the ultimate authority to disapprove all consumer loans.[8] Pocrnick answered only to Drummond, ProBank's president[9]; Drummond in turn answered directly to ProBank's Board of Directors. Drummond testified at trial that a "senior level title" was "very important" and a "really big deal."[10] In

---

[7](...continued)
court to decide the question. Because the issue was not raised on appeal, however, this court does not decide whether, even in light of undisputed evidence, the question of whether a high-ranking manager is his or her employer's alter ego is a question of fact for the jury or of law for the court.

[8]With regard to Pocrnick's supervisory position and influence at ProBank, Rotola testified that "[e]verybody always referred to [Pocrnick] like he was God of that bank."

[9]Rotola and Mallinson-Montague both testified that Pocrnick had an exceedingly close relationship with Drummond.

[10]Drummond testified as follows regarding Pocrnick's demotion after the allegations of harassment came to light:
        Q. Did you change [Pocrnick's] title from senior vice president to vice president?
        A. Yes.
        Q. Was that a demotion?
        A. That was a demotion.
        Q. Do demotions of that nature in terms of titles have any particular significance in your industry?
        A. Well, in my industry, titles are a really big deal, especially
                                                                    (continued...)

addition to his "very important" position as senior vice president, Pocrnick's status at ProBank was heightened by his service on both the Loan and Bank Management Committees, committees exercising policy-making functions.[11]

Although the district court erred in concluding that the alter ego instruction was appropriate simply because Pocrnick was the Plaintiffs' supervisor and exercised a high degree of control over them, *see Harrison*, 158 F.3d at 1376, this court can affirm the district court for any reason that finds support in the record. *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1248 (10th Cir. 2000) ("We are free to affirm the rulings of a district court on any ground that finds support in the record, even where the lower court reached its conclusions from a different or even erroneous course of reasoning." (quotation omitted)). The record evidence in this case, particularly the undisputed testimony of Drummond, leads this court to conclude that the alter ego instruction was appropriate under the particular,

---

[10](...continued)
a senior level title. Some say that bankers are paid in titles, but they're very important.
> Q. What was your intent in doing that to his title?
> A. To lower his status and reach into the organization.

[11]Drummond testified that "being on the loan committee is, along with being a big responsibility, it increases your status in the bank." Similarly, Drummond testified that service on the Bank Management Committee carried significant prestige and that in his capacity as a member of the committee, Pocrnick had reviewed "human resource polices and things like that."

narrow facts of this case establishing Pocrnick's high managerial rank at ProBank.

### 3. Attorney's fees

After prevailing on their Title VII claims at trial, the Plaintiffs moved for an award of attorney's fees pursuant to 42 U.S.C. § 2000e-5(k). ProBank opposed the fee request, asserting, *inter alia*, that because Plaintiffs' counsel's time records were inadequate, the fee request should be denied *in toto*. Although the district court drastically reduced the amount of attorney's fees ultimately granted the Plaintiffs, it rejected ProBank's assertion that such fees should be denied altogether.

The district court began by noting that "[u]nder the Title VII provision, a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1492 (10th Cir. 1994) (quotations omitted). Nevertheless, when applying for attorney's fees in federal civil rights actions, plaintiffs have the burden to "prove and establish [the] reasonableness of each dollar, each hour, above zero." *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995). To satisfy this burden, attorneys must keep and produce "meticulous time records" which "'reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks.'" *Id.* (quoting *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983)). Although the consideration of reconstructed time records is permissible

in determining an appropriate fee award, this court has noted that such records are likely to represent only an approximation of time actually expended. *Ramos*, 713 F.2d at 553 n.2

With this background in mind, the district court determined that the following factors supported the Plaintiffs' claims for attorney's fees:

> Plaintiffs did prevail on their main claim of sexual discrimination under Title VII. This case was fiercely defended by able counsel and the defendant Bank appears to have spared no expense on its defense. There were two plaintiffs, each with a different, but related, experience of discrimination. Plaintiffs' trial counsel . . . was prepared in the courtroom to efficiently present the case.

Nevertheless, in examining the number-of-hours-reasonably-expended portion of the lodestar formula,[12] the district court made, among others, the following findings: (1) "[t]he evidence at the hearing revealed that [Plaintiffs' lead counsel] kept only rough notes of his time and then would put the notes together every one to three weeks"; (2) "[w]ith [billing] entries lumped together the documentation is simply not adequate to determine the work performed" by Plaintiffs' lead counsel; (3) "[t]he 'lumping' together of items makes it impossible to determine accurately how much of the time was spent on research although it is clearly excessive for

---

[12]"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Although the reasonable-hourly-rate component of the lodestar formula was vigorously contested by the parties below, that portion of the district court's fee order is not at issue on appeal.

attorneys who are charging rates as experienced attorneys"; and (4) "the claim for hours spent on unspecified research shows how poor record keeping makes it impossible for the court to identify and eliminate duplication." In light of these findings, the district court noted that "inadequate documentation would justify denial of the entire [fee request]."

Although the district court indicated it had the discretion to deny the fee request altogether based upon the inadequate documentation, it declined to do so for the following reasons:

> First, [P]laintiffs prevailed on serious charges of unlawful conduct. The law provides for the payment of their attorneys fees as part of a comprehensive remedial scheme. They should not be denied the benefit of this law because their attorney failed to do his part. Second, [Plaintiffs' counsel] did do his job of preparing and presenting the case, thereby allowing his clients's rights to be vindicated. Lastly, to deny [counsel's] fee application in full would provide an unwarranted windfall to defendant Bank. The jury found the Bank committed unlawful discrimination. It would be unjust to allow the Bank to evade the full measure of damages imposed by the law because [P]laintiffs' attorney did not heed dispositive case law requiring meticulous and contemporaneous time records.

The district court did, however, drastically reduce the fee request, cutting the hours of Plaintiffs' lead counsel[13] by one-third, from approximately 880 claimed

---

[13]Interestingly, ProBank fails to note that the fee request in this case covered the work of three separate attorneys and one legal assistant. As to the approximately 200 hours of time attributed to the legal assistant and the two attorneys other than Plaintiffs' lead counsel, the district court noted that there had been no specific objection to the reasonableness of the fee request. Furthermore,

(continued...)

hours to approximately 590 awarded hours. In so doing, the district court specifically took into account the lumping of tasks into large blocks of time, with its concomitant lack of specificity and possibility of overlap with the work of other attorneys, and the failure to maintain the time records contemporaneously with the work performed.

ProBank's contention on appeal is both exceedingly narrow and easily resolved. ProBank asserts that once the district court determined counsel's time records were neither meticulous nor contemporaneous, it was obligated as a matter of law to deny the fee request *in toto*. To be clear, ProBank does not challenge any of the particulars of the district court's order granting fees but, instead, only challenges the district court's decision to award any fees at all.

This court "review[s] the district court's determination of reasonable hours for an abuse of discretion." *Jane L.*, 61 F.3d at 1510. Under this standard, we will reverse the district court only if its determination is "arbitrary, capricious, whimsical, or manifestly unreasonable." *See Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999) (quotation omitted). The real question in this case is whether the district court abused its discretion in determining that it could

[13](...continued)
the district court specifically found "the documentation for the hours claimed by these individuals to be sufficient." In light of this procedural history and the district court's specific finding, ProBank's assertion that the district court was obligated to deny Plaintiffs' fee request *in toto* is particularly suspect.

-24-

arrive at a reasonable fee in light of the documentation submitted by counsel. In this regard, we note that the district court specifically delineated those categories of hours claimed–research, meetings with the Plaintiffs, and trial preparation–in which counsel's shoddy record keeping made it difficult to determine whether the hours claimed were reasonably expended. Because it was difficult to evaluate the propriety of the fee request with regard to these categories of time, the district court reduced the fee request by 290 hours. Although ProBank did not include the Plaintiffs' fee application in its appellate appendix, it appears from the district court's order that this reduction of hours accounts for a substantial number of those hours claimed in the three categories identified as suspect by the district court. In light of the district court's superior perspective in determining the reasonableness of the number of hours expended, this court cannot conclude that the district court's tailored pruning of lead counsel's claimed hours was manifestly unreasonable or abusive. This is especially true when, after presiding over this case from beginning to end, the district court specifically found that the complete denial of fees would be inconsistent with the interests of justice.

As a final matter, this court notes that ProBank has not cited a single case setting forth the rigid, bright line rule it would have us impose. To the contrary, this court has specifically held that a district court did not abuse its discretion in reducing the hours-reasonably-expended portion of a loadstar calculation by

thirty-five percent when "[p]laintiffs' rather sloppy and imprecise time records failed to document adequately how plaintiffs' attorneys utilized large blocks of time." *Jane L.*, 61 F.3d at 1510. Accordingly, contrary to the assertions of ProBank, the actions of the district court are far from unprecedented. The district court specifically cited to, and relied upon, this court's decision in *Jane L.* in arriving at a reasonable fee award. We are similarly unconvinced that, absent ProBank's proposed bright-line rule, civil rights attorneys will have no incentive to maintain the meticulous records required by this court in *Ramos*. As noted by the district court, it would have operated well within its sphere of discretion in denying the fee request on the ground that it was not supported by adequate documentation. Practitioners in this circuit can take little comfort from our holding that, under the particular, narrow facts of this case, the district court did not abuse its discretion in awarding fees despite such inadequacies.

## B. Cross-Appeal, No. 98-1297

After prevailing on their Title VII claims before the jury, the Plaintiffs sought an award of back and front pay from the district court. In so doing, they recognized that they had resigned from ProBank and that the jury had rejected their constructive discharge claims. The Plaintiffs further acknowledged the Tenth Circuit has long held that an award of back pay is not available absent a showing of constructive discharge. *See Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342

(10th Cir. 1986) ("We agree . . . that the remedies of back pay and reinstatement are not available to [a plaintiff] unless [that plaintiff] was constructively discharged."). The Plaintiffs asserted, however, that *Derr* has been superseded by the 1991 amendments to the Civil Rights Act of 1964. *See* 42 U.S.C. § 1981a.

In particular, the Plaintiffs' noted that under pre-1991 law, victims of workplace discrimination were limited in their recovery to the narrow equitable remedies set out in 42 U.S.C. 2000e-5(g). *See Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1002 (10th Cir. 1996).[14] The 1991 amendments embodied in § 1981a, however, created a "major expansion in the relief available to victims of employment discrimination," allowing the recovery of compensatory damages even where victims of the illegal employment practice had not suffered workplace

_____

[14]In *Winsor v. Hinckley Dodge, Inc.*, this court noted as follows in that respect:

> Under pre-1991 law, plaintiff could not obtain compensatory damages, but was restricted to the traditional equitable remedies of reinstatement, back pay, and front pay, as well as declaratory and injunctive relief. *See Landgraf v. USI Film Prods.*, [511 U.S. 244, 252-55 (1994)]; *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1347 (10th Cir. 1994). "[E]ven if unlawful discrimination was proved, under prior law a Title VII plaintiff could not recover monetary relief unless the discrimination was also found to have some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential in compensation, or termination." *Landgraf*, [511 U.S. at 255]; *see also Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986) ("[T]he remedies of back pay and reinstatement are not available to [plaintiff] unless she was constructively discharged.").

79 F.3d 996, 1002 (10th Cir. 1996).

discrimination sufficient to rise to the level necessary to constitute a constructive

discharge.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 255, 253-55 (1994).

According to the Plaintiffs, the expanded remedies set out in § 1981a include the

right to recover back and front pay even if they had not been constructively

discharged by ProBank.

In concisely and cogently rejecting the Plaintiffs' assertion that § 1981a

expanded the availability of back pay as part of the newly-available compensatory

damages, the district court quoted from the following passage in the Supreme

Court's *Landgraf* opinion:

> Before the enactment of the 1991 Act, Title VII afforded only
> "equitable" remedies.  The primary form of monetary relief available
> was backpay.  Title VII's backpay remedy, modeled on that of the
> National Labor Relations Act, 29 U.S.C. § 160(c), is a "make-whole"
> remedy that resembles compensatory damages in some respects.
> *However, the new compensatory damages provision of the 1991 Act
> is "in addition to," and does not replace or duplicate, the backpay
> remedy allowed under prior law.*

511 U.S. at 252-53 (citations and footnotes omitted) (emphasis added).  The

district court further quoted the language of § 1981a, noting that the

compensatory damages awarded under that section "*shall not* include backpay,

interest on backpay, or any other type of relief authorized" under § 2000e-5(g).

42 U.S.C. § 1981a(b)(2) (emphasis added).[15]  Because the remedies available

---

[15]The Plaintiffs do not acknowledge on appeal the existence of this

(continued...)

under § 1981a do not displace or alter the remedies available under pre-1991 Title VII law, but instead merely supplement those remedies,[16] and because § 1981a(b)(2) specifically precludes the award of back pay as part of the new compensatory remedies provided therein, the district court concluded that "there is nothing in the 1991 Amendments to suggest that the case law applying those prior remedies is abrogated. Instead, it appears that those prior remedies, and the case law applying those remedies remain intact." Accordingly, the district court further concluded that the Plaintiffs' entitlement to back pay was controlled exclusively by § 2000e-5(g) and the case law interpreting it and not by the separate, supplemental remedies set out in § 1981a.[17]

---

[15](...continued)
language in § 1981a(b)(2).

[16]*See Landgraf*, 511 U.S. at 252-55.

[17]With regard to the Plaintiffs' claims for front pay, the district court held as follows:

> Front pay is "a . . . supplement to back pay, not a substitute for it." *Pitre v. Western Elec. Co.*, 843 F.2d 1226, 1279 (10th Cir. 1988). Front pay is granted to compensate "victims of discrimination for the continuing future effects of discrimination until the victim can be made whole." *Id.* at 1278. Thus, front pay may be used to supplement back pay when back pay will not adequately compensate the victim because immediate promotion cannot occur because there are no positions available, *id.*, or where reinstatement is not available and the victim is making less money at her current job. *Carter v. Sedgwick County*, 929 F.2d 1501, 1505 (10th Cir. 1991) . . . .

This court has nothing to add to the district court's thoughtful resolution of this issue. In light of the Supreme Court's opinion in *Landgraf* and the explicit statutory text of § 1981a(b)(2), it is clear that the Plaintiffs' claim for back and front pay is controlled by § 2000e-5(g). In *Derr*, this court explicitly held that the equitable remedy of back pay is only available under § 2000e-5(g) when the plaintiff has demonstrated that she was constructively discharged. *See* 796 F.2d at 342. Because the jury rejected the Plaintiffs' claims that they were constructively discharged, the district court did not err in concluding that they were not entitled to back or front pay.

## IV. CONCLUSION

The United States District Court for the District of Colorado is hereby **AFFIRMED** in all respects.